**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**MAY 17 2000**

**PATRICK FISHER**
**Clerk**

PUBLISH

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**

CAROL DOYAL,

      Plaintiff - Appellant,

v.

OKLAHOMA HEART, INC.,

      Defendant - Appellee.

No. 99-5040

**Appeal from the United States District Court**
**for the Northern District of Oklahoma**
**(D.C. No. 97-CV-805-C)**

Steven A. Novick, Attorney, Tulsa, Oklahoma, for Plaintiff-Appellant.

J. Patrick Cremin, Hall, Estill, Hardwick, Gable, Golden & Nelson, Tulsa, Oklahoma (J. Daniel Morgan, Gable & Gotwals, Tulsa, Oklahoma, on the brief) for Defendant-Appellee.

Before **BALDOCK** , **MCKAY** , and **ALARCÓN** ,* Circuit Judges.

---

      *      The Honorable Arthur L. Alarcón, Senior United States Circuit Judge for the Ninth Circuit, sitting by designation.

**ALARCÓN** , Circuit Judge.

Carol Doyal ("Doyal") appeals from the order granting summary judgment in favor of her former employer, Oklahoma Heart, Inc. ("Oklahoma Heart"). Doyal alleged that Oklahoma Heart terminated her employment as an administrator at Oklahoma Heart in violation of the Americans with Disabilities Act ("ADA"). Because Doyal failed to introduce evidence sufficient to support a reasonable conclusion that she was substantially limited in a major life activity or was regarded as such by Oklahoma Heart, we affirm.

I

Oklahoma Heart is a cardiology practice group. Doyal began working as an administrator at Oklahoma Heart in April 1992. The company grew and, over time, Doyal's responsibilities grew as well. In January 1995, Oklahoma Heart began moving its billing and accounting functions in house. At that time, Doyal was serving as the business office manager for Oklahoma Heart. The conversion to the new billing and accounting computer system was to be completed by April 1995. The conversion was stressful for the affected Oklahoma Heart employees, including Doyal.

In early 1995, Doyal began to experience "significant feelings of

helplessness, anxiety, excessive stress and lack of motivation" as well as "difficulty thinking clearly, concentrating, learning, remembering, and interacting with others." She felt disinterested in work, life, eating, and caring for herself. She experienced insomnia, often sleeping only one to three hours a night. She also began to experience panic attacks. In March 1995, she experienced a "mental breakdown" at work, during which she cried and told her supervisor, Steven Struttman, how stressed and overworked she felt. Struttman told her to take a week off.

During Doyal's week off, she saw Dr. Katherine Klassen, a psychiatrist, who diagnosed her with "Major Depression, moderate, with anxiety attacks." Dr. Klassen prescribed an anti-depressant medication. Doyal testified during her deposition that the medication "helped tremendously." Dr. Klassen also recommended that she work with her employer to arrange for a "reduced stress/work load." Upon her return to work after her week off, Doyal asked Oklahoma Heart to give her a new position. She transferred to the position of human resources director. The change in her responsibilities was accompanied by a reduction in her pay.

In her new position, Doyal continued to have problems with her memory and concentration, forgetting the names and qualifications of candidates for jobs. She also threw away medical records on one occasion, believing that she had been

given permission to do so by one of the doctors at Oklahoma Heart. In late April 1995, Doyal was briefly hospitalized for what her psychiatrist concluded was a stress-related illness. On May 16, 1995, Oklahoma Heart terminated her employment. Struttman provided Doyal with a letter listing the reasons for her discharge. The letter cited her inability to make decisions and her lapses of memory, judgment, and confidentiality.

## II

The ADA prohibits employers from discriminating against individuals on the basis of disability. See 42 U.S.C. § 12112(a). To prevail on her ADA discrimination claim, Doyal had to establish that: (1) she is a disabled person as defined by the ADA; (2) she is qualified, with or without reasonable accommodation, to perform the essential functions of the job held or desired; and (3) the employer discriminated against her because of her disability. See Taylor v. Pepsi-Cola Co., 196 F.3d 1106, 1109 (10th Cir. 1999). Doyal bore the burden of raising a genuine issue of material fact on each element of her prima facie case. See id. We review de novo an order granting a motion for summary judgment. See Simms v. Oklahoma ex rel. Dep't of Mental Health, 165 F.3d 1321, 1326 (10th Cir.), cert. denied, ___ U.S. ___, 120 S. Ct. 53 (1999).

Disability is a term of art under the ADA. The statute defines disability

-4-

as: (A) a physical or mental impairment that substantially limits one or more of the major life activities of such individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment. 42 U.S.C. § 12102(2). Doyal alleges she comes within subsections (A) and (C).

"[C]onsideration of subsection A of the definition proceeds in three steps." Bragdon v. Abbott, 524 U.S. 624, 118 S. Ct. 2196, 2202 (1998). First, the court must determine whether the plaintiff has an impairment. See id. Second, the court must identify the life activity upon which the plaintiff relies and determine whether it constitutes a major life activity under the ADA. See id. Third, the court asks whether the impairment substantially limited the major life activity. See id.

Here, it appears to be undisputed that depression is an impairment. We therefore proceed to Step Two.

The ADA does not define the term "major life activity." That term has been construed to mean a "basic activity that the average person in the general population can perform with little or no difficulty." See Pack v. Kmart Corp., 166 F.3d 1300, 1305 (10th Cir. 1999). Major life activities include such functions as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, sleeping, sitting, standing, lifting, reaching, and working. See Poindexter v. Atchison, Topeka & Santa Fe Ry. Co.,

-5-

168 F.3d 1228, 1231-32 (10th Cir. 1999). "The Supreme Court in Bragdon made clear that the court, in making determinations of law and formulating jury instructions, is to analyze only the major life activity asserted by the plaintiff." Id. (discussing Bragdon, 524 U.S. at ___, 118 S. Ct. at 2205).

In Doyal's brief to this court, she asserts that her depression limited her ability to perform the following life activities: learning, sleeping, thinking, and interacting with others. Learning and sleeping are recognized major life activities. See Poindexter, 168 F.3d at 1231. Doyal cites the EEOC Guidance on Psychiatric Disabilities and the Americans with Disabilities Act as authority for her position that thinking and interacting with others are also major life activities . The EEOC Guidance is not, however, controlling authority. See Pack, 166 F.3d at 1305 n.5. We will nevertheless assume for the sake of argument that, along with learning and sleeping, thinking and interacting with others constitute major life activities. We now proceed to Step Three.

In order for an impairment to be substantially limiting, the individual must be

> (1) Unable to perform a major life activity that the average person in the general population can perform; or
> (2) Significantly restricted as to the condition, manner or duration under which an individual can perform a particular major life activity as compared to the condition, manner or duration under which the average person in the general population can perform that same major life activity.

29 C.F.R. § 1630.2(j)(1). Doyal does not contend that she was unable to perform the life activities of sleeping, learning, thinking, and interacting with others. In determining whether she was significantly restricted in any of these four activities, we consider the following factors: (1) "[t]he nature and severity of the impairment;" (2) "[t]he duration or expected duration of the impairment;" and (3) "[t]he permanent or long term impact, or the expected permanent or long term impact of or resulting from the impairment." 29 C.F.R. § 1630.2(j)(2). We also consider the effects of corrective or mitigating measures, both positive and negative, on the impairment. See Sutton v. United Airlines, Inc., 527 U.S. 471, 119 S. Ct. 2139, 2146 (1999); Pack, 166 F.3d at 1305 (10th Cir. 1999).

In her opposition to the motion for summary judgment, Doyal introduced the affidavit of Ed Miles, Ph.D., a clinical psychologist. In his affidavit, Dr. Miles stated that he concurred in the diagnosis of Doyal's treating psychiatrist that Doyal suffered major depression with anxiety attacks. Dr. Miles also stated that

> symptoms of a major depressive episode include moderate to severe limitations on the ability to think and learn, including impaired memory and ability to concentrate on tasks. Other symptoms of a major depressive episode include lack of motivation, disruption of sleep patterns, and significant limitations on a person's ability to interact appropriately with others. The limitation on interpersonal interactions would be even more significant if the depression is compounded by panic attacks.

Dr. Miles did not, however, address the extent to which Doyal experienced these

symptoms. An inquiry into whether a plaintiff is substantially limited in a major life activity requires an individualized analysis because an impairment that is disabling for some may not be disabling for others. See 42 U.S.C. § 12102(2). We therefore must consider the evidence Doyal offered in an effort to demonstrate that she was significantly restricted in learning, sleeping, thinking, or interacting with others.

A. Learning

In her opposition to the motion for summary judgment, Doyal failed to present evidence of any specific instances where she had difficulty in learning. In Doyal's deposition and declaration, she generally asserted that she tended to forget the names of candidates she had interviewed for jobs. Doyal also introduced the letter she received upon her discharge and an internal memorandum written by Gay Barnes, Doyal's replacement in the position of business office manager of Oklahoma Heart, in which she reported that Doyal sometimes forgot the names of job candidates and new hires.

Forgetfulness is an exceedingly common human frailty. Many of us tend to forget names. This is particularly so where we briefly meet a lot of different people, as Doyal did in her role as human resources director for Oklahoma Heart. Without more, the fact that Doyal tended to forget the names of candidates for

employment and other unspecified things is insufficient evidence to support a reasonable inference that she was significantly restricted in her ability to learn.

Doyal asserts for the first time before this court that she was unable to learn the new computer system. Doyal did not offer any evidence in her opposition to the motion for summary judgment regarding her inability to learn the new computer system, the efforts she undertook to learn it, or how her efforts to master the system compared with those of other employees. Indeed, Struttman and Dr. Wayne Leimbach testified during their depositions that the transition to the new computer system was difficult for all involved, not just for Doyal.

Because Doyal introduced no evidence suggesting she experienced greater difficulty than anybody else learning the new computer system or any other new material, she has failed to demonstrate that she was significantly restricted in learning. See 29 C.F.R. § 1630.2(j)(2) (providing that whether a person is "significantly restricted" in her performance of a major life activity is to be evaluated relative to the condition, manner or duration under which the average person in the general population can perform that same activity); see also Bowen v. Income Producing Management, Inc., 202 F.3d 1282, 1287-88 (10th Cir. 2000) (recognizing that, to be significantly restricted in learning, one's skills and abilities must be inferior to those of the average person).

B. Sleeping

In a declaration filed in opposition to the motion for summary judgment, Doyal stated that "shortly after starting working at Oklahoma Heart [in 1992], I began experiencing insomnia. Frequently, I would sleep only one to three hours a night. I began taking medication to help me sleep. Sometimes the medication would help and sometimes it didn't." She also stated that, "[a]s the first few weeks of 1995 passed . . . . I was having a very hard time getting sleep even with my medication." Dr. Klassen's March 31, 1995, examination report noted that Doyal "had insomnia for two years, for which she has taken Xanax."

Doyal also stated in her declaration that, around the time she assumed the position of human resources director in April 1995, "I now found I was sleeping for exceedingly long periods. Most days, I would go to work, come home, and go straight to bed until the following morning." A memorandum from Barnes to Struttman that detailed Barnes "interactions with Carol Doyal from April 17 to April 27, 1995" stated that Doyal told Barnes she had been sleeping for "long stretches" of up to fourteen hours.

Doyal's allegations are similar to the allegations that were before this court in  Pack . Teresita Pack started working at Kmart in 1976.       See Pack , 166 F.3d at 1302. She held a variety of positions at the store and her employment record was excellent.      Id.  In late 1993, she began seeing a doctor

for stress-related physical and emotional problems. Id. At roughly the same time, Pack's job performance began to decline. Id. She made technical errors in the Kmart pharmacy, including mislabeling prescriptions and incorrectly inputting prescription data into the pharmacy computer. Id.

Pack suffered a "nervous breakdown" in May 1994. Id. at 1303. She took a six-week leave of absence. Id. at 1302. She was diagnosed during her leave of absence with moderate to severe major depression. Id. On returning to work, Pack received an unsatisfactory annual evaluation. Id. She took a second leave of absence. Id. On her return, Pack continued to make the same type of errors. Id. at 1303. Kmart discharged her in February 1995 based on her continued errors in processing prescriptions. Id.

Pack filed an ADA claim against Kmart. This court was called upon to decide whether the evidence introduced supported a reasonable conclusion that Pack was substantially limited in the major life activity of sleeping. Id. at 1305. This court concluded that "the evidence showed that Pack had episodes of sleep disruption and/or waking without feeling rested during 1994 and January 1995 [but that] there is no indication that her sleep problems were severe, long term, or had a permanent impact." Id. at 1306. This court also noted that the evidence showed that Pack's doctor "was able to generally control Pack's sleep problems with medication, even going too far in some instances, resulting in making her

-11-

too sleepy or drowsy." Id. This court held that Pack failed to present evidence that her impairment substantially limited her ability to sleep and affirmed the order granting judgment as a matter of law to Kmart. Id.

As was true in Pack, the evidence here showed that Doyal suffered at times from insomnia. As was true in Pack, the evidence showed that Doyal's problems were mitigated, though not cured, by medication. Moreover, the evidence here showed that, by the time of Doyal's discharge, she was sleeping as much as fourteen hours a night. While excessive sleepiness may pose another problem, the fact that Doyal was sleeping for such long periods precludes an inference that her insomnia was severe, permanent, and untreatable enough to support a reasonable conclusion that she was significantly restricted in her ability to sleep.

C. Thinking

We next consider the evidence offered to support the conclusion that Doyal was significantly restricted in her ability to think. The allegations relating to Doyal's ability to think are much the same as those that related to Doyal's ability to learn. In addition to those, Doyal also generally alleged in her deposition and her declaration that she experienced difficulty "focusing" and making decisions.

-12-

The most concrete evidence Doyal introduced to support her contention that she was significantly restricted in her ability to think is the memorandum by Barnes in which she noted that Doyal had "obvious difficulty" choosing between job candidates and "appeared to have trouble making even simple decisions." Without more, however, we are unpersuaded that such indecisiveness could be said to amount to or to evince a significant restriction on Doyal's ability to think. Doyal also introduced Dr. Klassen's March 31, 1995, examination report which stated that "the patient tends to exaggerate her memory and concentration difficulties in a characteristic pattern of depression." We conclude that Doyal failed to introduce evidence sufficient to create a genuine issue of material fact as to whether she had a significant restriction on her ability to think.

D. Interacting with Others

Doyal introduced little evidence relevant to her contention that she was significantly restricted in her ability to interact with others. She asserted in her declaration that her depression caused her to become lax in her personal hygiene, to discontinue "visiting with . . . friends," and to become withdrawn from her coworkers. Oklahoma Heart introduced uncontradicted deposition testimony by Dr. Leimbach that, during the time period in issue, Doyal attended management meetings, laughed at jokes, and interacted normally with him. Doyal's evidence

-13-

was insufficient to demonstrate that she was significantly restricted in her ability to interact with others relative to the average person in the general population. See McAlindin v. County of San Diego, 192 F.3d 1226, 1235 (9th Cir. 1999), amended by 201 F.3d 1211 (9th Cir. 2000) (holding that interacting with others is a major life activity and that, in order to show a substantial limitation, "'a plaintiff must show that his relations with others were characterized on a regular basis by severe problems, for example, consistently high levels of hostility, social withdrawal, or failure to communicate when necessary'") (quoting EEOC Guidance on Psychiatric Disabilities and the Americans with Disabilities Act at E-4 (1997)).

## III

Doyal contends that, even if she was not actually disabled, she was perceived by Oklahoma Heart as being disabled as that term is defined in the ADA. See 42 U.S.C. § 12102(2) (stating that a person may be disabled under the ADA if he is "regarded as having" an impairment that substantially limits one or more of the major life activities of the individual). A person is regarded as having a disability if "(1) a covered entity mistakenly believes that the person has a physical impairment that substantially limits one or more major life activities, or (2) a covered entity mistakenly believes that the person's actual

nonlimiting impairment substantially limits one or more major life activities." Sorenson v. University of Utah Hosp., 194 F.3d 1084, 1088 (10th Cir. 1999) (quoting Sutton, 527 U.S. ___, 119 S. Ct. at 2149-50). "In both cases, it is necessary that [the employer] entertain misperceptions about the individual–it must believe either that [the individual] has a substantially limiting impairment that [the individual] does not have or that [the individual] has a substantially limiting impairment when, in fact, the impairment is not so limiting." Sutton, 527 U.S. ___, 119 S. Ct. at 2150.

Doyal maintains that Oklahoma Heart management regarded her as being substantially limited in a major life activity. To support her claim, Doyal points to statements by management that she was "incapacitated" and that her difficulties at work were "not a fixable problem." Such generalized statements, however, do not support the conclusion that management misperceived her as being substantially limited in learning, sleeping, thinking, or interacting with others. Indeed, Struttman and Dr. Leimbach both testified in their depositions that the conversion to the new computer system was difficult for everyone involved, not just Doyal. Barnes's memo revealed that she understood Doyal was sleeping as much as fourteen hours a night. Dr. Leimbach testified in his deposition that Doyal appeared and behaved normally during the time period in issue.

-15-

The evidence introduced supports the conclusion that Oklahoma Heart's management perceived Doyal as being unmotivated, forgetful, and irremediably unhappy in her job. The evidence in this record does not, however, support the conclusion that management misperceived Doyal as being substantially limited in a major life activity, as required under Sutton.

The order of summary judgment is AFFIRMED.