**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**MAY 16 2005**

**PATRICK FISHER**
**Clerk**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

SYLVIA BURNS,

     Plaintiff-Appellant,

v.

JOHN W. SNOW, Secretary of the
United States Department of the
Treasury,

     Defendant-Appellee.

No. 04-1349
(D. Colo.)
(D.Ct. No. 03-Z-690 (BNB))

**ORDER AND JUDGMENT**[*]

Before **TACHA**, Chief Circuit Judge, and **PORFILIO** and **BRORBY**, Senior
Circuit Judges.

After examining the briefs and appellate record, this panel has determined

unanimously that oral argument would not materially assist the determination of

this appeal. *See* Fed. R. App. P. 34(a)(2); 10th Cir. R. 34.1.9(G). The case is

therefore ordered submitted without oral argument.

---

[*] This order and judgment is not binding precedent except under the
doctrines of law of the case, *res judicata* and collateral estoppel. The court
generally disfavors the citation of orders and judgments; nevertheless, an order
and judgment may be cited under the terms and conditions of 10th Cir. R. 36.3.

Appellant Sylvia Burns appeals the district court's grant of summary judgment in favor of Appellee John W. Snow, Secretary of the United States Department of the Treasury (the Government), regarding her allegations employees of the United States Mint in Denver, Colorado (the Mint), failed to accommodate her disability and subjected her to sexual harassment and retaliation in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e through 2000e-17; and the Rehabilitation Act of 1973, 29 U.S.C. §§ 701-32, 741, 751, 760-65, 771-76, 780-85, 791-96. We exercise jurisdiction under 28 U.S.C. § 1291 and affirm.

## I. Factual Background

"In setting forth the facts, we view the evidence in the light most favorable to the non-moving party, as we must when reviewing a grant of summary judgment." *Baca v. Sklar*, 398 F.3d 1210, 1213 (10th Cir. 2005) (quotation marks and citation omitted). Summary judgment is appropriate "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case ...." *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). Thus, for the purpose of reviewing the district court's summary judgment decision, we consider the following facts, which are either undisputed or uncontested, and/or based on the admissions and testimony of Ms. Burns during

the course of litigation in support of her claims, and which, even if true, we determine cannot defeat summary judgment in this case.

A.  Production and Attendance

On May 10, 1999, Ms. Burns was hired by the Mint as a probationary employee in the position of Counting Machine Operator, working the graveyard shift.  The duties of a counting machine operator include using a counting machine to count and bag a specified number of cents, nickels, dimes and quarters.  At the Mint, probationary employees like Ms. Burns are hired for a one-year trial period, during which their performance, attendance and compliance with workplace polices are monitored, and they are required to demonstrate fitness for permanent hiring.  Counting machine operators are required to meet certain numerical production standards for each type of coin, and performance below 95% of the standard is considered unacceptable.  An employee may be terminated at any time during the probationary period for failure to demonstrate fitness and qualifications for continued federal employment, and has no right to warnings or progressive forms of discipline.

During the period of Ms. Burns's probationary employment with the Mint the demand for new U.S. coins increased.  As a result, the Mint operated twenty-

four hours a day, seven days a week, which resulted in employees generally being required to work a six-day-per-week schedule. The Mint also gave employees the option of volunteering to work on the seventh day of each week. Attendance is a concern for the Mint because employees with unreliable attendance interfere with its ability to meet demanding production requirements. During Ms. Burns's job interview, when asked whether she could work overtime, including six days a week, she said she could. However, according to Ms. Burns, both the individual who interviewed her and the doctor who performed her pre-employment medical examination for the Mint told her employees hardly ever worked overtime at the Mint.

During a period of at least twenty weeks, between June 1999 and March 2000, Ms. Burns volunteered to work overtime on her one scheduled day off. In addition, for a total of twelve weeks between July 1999 and March 2000, she voluntarily worked more than forty-eight hours a week. During her probationary period, Ms. Burns never informed her direct supervisor, Tom Romero, that working overtime caused any medical problems and never asked him to excuse her from working scheduled overtime for any reason.

While Ms. Burns volunteered to work overtime, her personnel records are

replete with performance appraisals evidencing deficiencies in her performance and attendance. Records show she failed to perform at the 95% required level on certain coins throughout her probationary period; they also contain entries by Mr. Romero stating he verbally counseled Ms. Burns about her production deficiencies, after which, he noted, she continued to perform below the required level. In addition, due to numerous incidents of tardiness and uses of unscheduled leave, personnel records show Mr. Romero verbally counseled Ms. Burns, warning she would be required to bring in medical documentation each time she called in sick. While Ms. Burns gave sundry reasons for being late and taking unscheduled leave, one notation shows the reason she gave for missing work on September 30, 1999, was for a "lupus flare-up." On December 17, 1999, Mr. Romero prepared a document which stated Ms. Burns failed to meet performance standards and had received counseling on her attendance; it also stated that if she failed to improve her performance, she would be discharged from her probationary employment for non-production. Ms. Burns signed the document, indicating it had been discussed with her.

Thereafter, records show Ms. Burns was tardy at least one more time, had at least ten more unscheduled leave occurrences, and her production on nickels continued to be below the required 95% level. In total, over the course of her

eleven-month probationary employment, Ms. Burns was tardy for work at least seven times and took unscheduled leave at least eighteen times.[1]  On April 18, 2000, Ms. Burns took another sick leave absence, and on the same day, the Mint fired Ms. Burns, effective April 19, 2000, based on "unacceptable" or "unreliable" attendance and "unacceptable" or "substandard" production output.

Three years after her termination, and two years after an unsuccessful EEOC agency action, Ms. Burns filed the instant action against the Mint, asserting its employees failed to accommodate her disability relating to lupus and subjected her to sexual harassment and retaliation in violation of Title VII of the Civil Rights Act, and the Rehabilitation Act.  The record reveals the following evidence relating to her claims.

## B.  Disability Claim

In her written application for employment with the Mint, Ms. Burns represented her prior "job involved using physical strength, standing for long periods of time, ... walking and so on."  During her job interview, when asked if

---

[1]  Other than one entry for a "lupus flare-up," the other medical reasons provided by Ms. Burns for unscheduled sick leave included migraines or headaches, "illness," "UTI pain," fevers and/or flu, earache, cut finger, sinus infection, and urinary tract infection.

she would have difficulty lifting bags weighing twenty-eight to fifty pounds and standing for eight hours a shift, she responded, "No. I do it now," and as previously mentioned, she indicated she could work overtime, including six days a week. Ms. Burns claims she told the person interviewing her for the Mint job she had lupus.

As part of the hiring process, Ms. Burns underwent a physical examination and filled out an occupational history questionnaire. In response to the question, "Do you have any problems you would like to discuss with the doctor?" Ms. Burns wrote, "Kaiser had treated me for lupus for 2 years or so but now I'm negative. I took quinine pills it helped the rash." She also completed a "Self-Identification of Handicap" form on which she indicated she possessed no disability. Part of her physical examination included an assessment of whether she could perform the functional requirements of the job, including heavy lifting and carrying of forty-five pounds or more, and walking and standing for eight hours. Section A5 of the form asked Ms. Burns whether she had any medical disorder or physical impairment which could interfere in any way with the full performance of these functional requirements, to which she answered, "no," and signed the form, certifying the information was correct. Following her physical, the examining physician recommended she be hired with no limitations.

Ms. Burns now claims she had difficulty walking and standing on three or four occasions during her eleven months of employment at the Mint. While she missed work on April 18, 2000, due to lesions on her feet, which her doctor described as a painful foot condition, she contends she was terminated due to her "flare up of lupus" on that same date. Although Ms. Burns brought in doctors' notes on other medical conditions, she never submitted one diagnosing her with lupus or indicating a need to accommodate her lupus. In fact, while Ms. Burns claims she was diagnosed with diskoid lupus in March 1997, none of the three rheumatologists who examined her on at least four occasions from 1998 to 2002 diagnosed or confirmed she had lupus. Furthermore, Ms. Burns submitted no medical information confirming she had lupus, and admitted that in January 2000 she told Dave Cruz, her second-line supervisor, and other coworkers at the Mint a doctor told her she did not have lupus. She also acknowledged a doctor told her she did not suffer from diskoid lupus, but rather experienced "atopic dermatitis," she was unsure if she had lupus, and did not recall if any doctor told her that her condition would affect her ability to work overtime.

## C. Harassment

While at work at the Mint, Ms. Burns stated she was shown at least four or

five sexually-oriented photographs or cartoons,[2] and in one case, approached a group of male coworkers in order to see a photo of topless women, which she found "mildly offensive." When shown these and other sexual images at work, Ms. Burns acknowledged she sometimes responded by laughing or chuckling, or making lewd or crude comments which caused her coworkers to laugh. Ms. Burns claims she behaved this way because she was afraid she would "offend somebody" or would experience reprisal.

Ms. Burns testified most of the cartoons and jokes she was shown were of natural acts or bare-breasted women. While she found two of the pictures "offensive," she admitted that after she expressed being offended she was never shown them again. Ms. Burns also acknowledged she discussed sex at work when questioned about it, and even volunteered intimate information about her first husband. Even though the Mint maintained a written sexual harassment policy and Ms. Burns had experience with the Mint's Equal Employment Opportunity Office, having contacted it on another issue, she admitted she never "seriously" informed those around her that she was offended by any of the sexual materials,

---

[2] Specifically, the items about which Ms. Burns complains included a cartoon of President Bill Clinton engaged in oral sex with a female; a man groping a woman on a couch; a photograph of a vagina with something "huge" inserted in it; a photograph of topless large-breasted women on a river boat; and a photograph of a walrus with a flipper pointing toward its crotch area.

stating only that she was "afraid to."

In support of her harassment claim, Ms. Burns also alleged Mr. Cruz brought in or observed pornographic materials on the workroom floor; discussed his and his father's sex lives; twice commented on the size of his penis; said he was promoted by sleeping with a female supervisor; purchased Ms. Burns two t-shirts;[3] asked her out or to move in with him; and commented on her cleavage. However, Ms. Burns admits this same supervisor also gave t-shirts to male crew members; bought one of the t-shirts at her request, although he declined payment for it; and left her alone after she told him "he needed therapy," and that she "couldn't date anybody who was like that." When Mr. Cruz commented on sleeping with a female supervisor to get promoted, Ms. Burns asked Mr. Romero if this was true, in response to which he nodded his head, making her feel like "they were preying on" her. She believes Mr. Cruz made these comments about sleeping with his supervisor in response to her requests for training, making her believe he was seeking sexual favors in return for such training. With respect to Mr. Cruz's comments about her cleavage, she said it made her feel like "a piece of meat."

---

[3] Ms. Burns points out she wore "biker" t-shirts to work, which Mr. Cruz inappropriately admired, and that he presented her with a black Harley Davidson shirt he got on a trip.

With regard to her first-level supervisor, Mr. Romero, Ms. Burns claims he knew another employee brought pornographic material into the workplace (including one of the pornographic pictures of which Ms. Burns now complains), and failed to do anything about it until 1999, when he counseled the employee. She also suggests Mr. Romero "asked her out" twice. According to Ms. Burns, the first time he asked her out by saying, "we should get together," when she told him he was a good-looking man and his wife must be beautiful. The second time, he allegedly stated "we should get to know each other better," to which she responded by pointing out they had just gone through in-house sexual harassment training and one of them could get in trouble talking about it; stating, "we can't go around behaving like a bunch of idiots." She admitted Mr. Romero's comments were "just his sense of humor," and that his and other coworkers' "vulgar" senses of humor "kind of rubbed off on [her]." She also admitted she told Mr. Romero he had a "tight butt," and requested a copy of "raunchy" jokes from him which contained sexual innuendo, and which she shared with her teenage son. In fact, during her 2001 EEOC hearing on the matter, Ms. Burns acknowledged Mr. Romero did not make sexually advancing or sexually harassing comments to her.

-11-

D. Retaliation and Failure to Accommodate Claims

In December 1999, Ms. Burns contacted an EEO counselor and filed a complaint, alleging the Mint had failed to train (or properly train) her on certain equipment. At the time she met with the EEO counselor, Ms. Burns claims she told him she was being harassed by both Mr. Cruz and Mr. Romero because she had moved in with a coworker, Mr. Watts, in late September or early October, and because she would not give into their "whims." She now claims she did not include this on her EEO complaint because she feared retaliation. On January 24, 2000, she unconditionally withdrew her EEO complaint.

Ms. Burns also claims that at her meeting with the EEO counselor she advised him she had lupus and had applied for a job in the mills because she knew it would allow her to work "light duty." In addition, sometime during the first six months of her job, Ms. Burns says she told her supervisors, Mr. Cruz and Mr. Romero, her foot hurt, she had lupus, and she had applied for a mill job which she thought would be easier. Ms. Burns did not get an interview for the mill job; instead, two other candidates did, including one person who scored higher on a knowledge and skills assessment, and another who scored higher due to veterans' preference points. When Ms. Burns found out she was not selected for a position in the mills, she told a human resources employee she was not feeling well and

-12-

that her lupus was flaring up.

During the period of Ms. Burns's employment, Mr. Cruz dated an employee at the Mint who had lupus, whose medical condition was accommodated by not working overtime, and who provided medical documentation in support of her accommodation. Ms. Burns's other supervisor, Mr. Romero, knew someone with lupus might require reasonable accommodations at the Mint and an employee making such a disability claim must provide a doctor's note, but nevertheless, did not ask Ms. Burns for any medical documentation. While Ms. Burns told Mr. Romero she had lupus, she never asked for an accommodation, never brought in medical documentation confirming her medical condition, and told Mr. Cruz that a doctor said she did not have lupus.

In January 2000 Ms. Burns contacted someone from the EEO office at the Mint and told her she was having problems and needed help; a month later, she was informed she needed to fill out a form. In late March, Ms. Burns received a form from the EEO office, which required a doctor identify her disease and restrictions; however, she did not submit the form prior to her termination. In late April 2000, following her termination, she filed an EEO complaint involving claims of disability, failure to accommodate, sexual harassment, and retaliation.

## II. Procedural Background

An EEOC hearing was held in November 2001 on Ms. Burns's EEO complaint. Unsuccessful in her action, Ms. Burns filed her First Amended Complaint in federal court July 2, 2003, claiming Mint employees failed to accommodate her disability relating to lupus and subjected her to sexual harassment and retaliation in violation of Title VII of the Civil Rights Act, and the Rehabilitation Act. Following discovery, the district court held a hearing on the Government's motion for summary judgment, at which time it issued a bench ruling determining Ms. Burns failed to: 1) provide any medical documentation she was disabled, or rebut the Mint's expert's medical opinion and assessment that she did not have lupus, for the purpose of showing she is a qualified person within the meaning of the Rehabilitation Act as having a disability which substantially impairs a major life activity or prevents her from performing a wide range of jobs; 2) establish conduct at the Mint was sufficiently severe or pervasive enough to support a *quid pro quo* sexual harassment claim, or otherwise show conduct that altered the condition of her employment and created an abusive working environment, or that any impermissible conduct was related to her gender; or 3) show a sufficient causal link between her complaints and her termination to support a retaliation claim.

In addition, the district court held the Mint provided legitimate, nondiscriminatory, non-retaliatory reasons for terminating Ms. Burns, who was a probationary employee with unreliable attendance, tardiness and unacceptable production levels. With respect to the Mint's reasons not to transfer Ms. Burns to a mill job, the district court relied on Ms. Burns's work deficiencies and the fact the two other people who received interviews for the mill job were more qualified, to reject her accommodation and retaliation claims. Based on this and other reasoning, the district court determined Ms. Burns failed to provide a sufficient showing of triable issues of fact to overcome summary judgment, granted the Government's motion for summary judgment, dismissed her amended complaint with prejudice, and entered judgment in favor of the Government.

## III. Discussion

### A. Standard of Review

"We review a district court's grant of summary judgment de novo, using the same standards applied by the district court." *Baca*, 398 F.3d at 1216. "We view the evidence and reasonable inferences drawn from the evidence in the light most favorable to the nonmoving party," and "grant summary judgment only where 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any

-15-

material fact and that the moving party is entitled to a judgment as a matter of law.'" *Id.* (quoting Fed. R. Civ. P. 56(c)). As previously noted, summary judgment is appropriate "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case ...." *Celotex*, 477 U.S. at 322. Summary judgment is appropriate "[i]f a reasonable trier of fact could not return a verdict for the nonmoving party ...." *White v. York Int'l Corp.*, 45 F.3d 357, 360 (10th Cir. 1995). "We may affirm the district court for any reason supported by the record." *Baca*, 398 F.3d at 1216 (quotation marks and citation omitted).

## B. Disability and Failure to Accommodate

On appeal, Ms. Burns asserts the district court erred in granting summary judgment based solely on her failure to provide a conclusive medical opinion on her disability; she contends she was only required to advise her employer of her medically-required restrictions and possible ways to accommodate them. Ms. Burns claims she sufficiently raised the issue of having lupus and the need for a reasonable accommodation when she gave "lupus flare-up" as a reason for missing one day of work; told various other employees, including her two supervisors, she had lupus; and reported to an EEO counselor she had lupus and hoped to get a job in the mills. In general, Ms. Burns complains her lupus limited

-16-

her in her ability to stand and walk with respect to the overtime hours required for her position.

The Americans with Disabilities Act of 1990 (ADA) provides that "[n]o covered entity shall discriminate against a qualified individual with a disability because of the disability of such individual in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a). "Merely having an impairment does not make one disabled for purposes of the ADA." *Toyota Motor Mfg., Ky., Inc. v. Williams*, 534 U.S. 184, 195 (2002). To prevail under the ADA, an employee must establish: "(1) she is a disabled person as defined by the ADA; (2) she is qualified, with or without reasonable accommodation, to perform the essential functions of the job held or desired; and (3) the employer discriminated against her because of her disability." *Doyal v. Okla. Heart, Inc.*, 213 F.3d 492, 495 (10th Cir. 2000).

"To establish a prima facie case of discrimination under the ADA, Plaintiff must first establish that [she] is 'disabled' within the meaning of the statute." *Lusk v. Ryder Integrated Logistics*, 238 F.3d 1237, 1239 (10th Cir. 2001).

"Disability" is statutorily defined or established by showing: "(A) a physical or mental impairment that substantially limits one or more of the major life activities of [an] individual; (B) a record of such impairment; or (C) being regarded as having such an impairment." *Id.* (relying on 42 U.S.C. § 12102(2)) (alteration in original). A "major life activity" is a "basic activity that the average person in the general population can perform with little or no difficulty," and includes walking, standing, sitting, lifting and working. *Doyal,* 213 F.3d at 495-96 (quotation marks and citation omitted). In order for the impairment to be substantially limiting, the individual must be:

> (1) [u]nable to perform a major life activity that the average person in the general population can perform; or (2) [s]ignificantly restricted as to the condition, manner or duration under which an individual can perform a particular major life activity as compared to the condition, manner, or duration under which the average person in the general population can perform that same major life activity.

*Id.* at 496 (quoting 29 C.F.R. § 1630.2(j)(1)). Moderate restrictions on the ability to walk and stand have been determined not to amount to a substantial limitation,[4] and we have held comparative evidence must be produced on the issue of lifting to show such an activity is substantially limited, unless the impairment appears

---

[4] *See Talk v. Delta Airlines, Inc.*, 165 F.3d 1021, 1025 (5th Cir. 1999) (walking); *Penny v. United Parcel Serv.*, 128 F.3d 408, 415 (6th Cir. 1997) (same); *Kelly v. Drexel Univ.*, 94 F.3d 102, 106 (3rd Cir. 1996) (same); 29 C.F.R. Pt. 1630, App. 1630.2(j) (same)*. See also Taylor v. Pathmark Stores, Inc.,* 177 F.3d 180, 186-87 (3rd Cir. 1999) (standing); *Gallimore v. Newman Mach. Co.*, 301 F.Supp.2d 431, 445-46 (M.D.N.C. 2004) (same).

substantially limiting on its face. *See Lusk*, 238 F.3d at 1240-41. To aid in assessing whether a major life activity is substantially limited, the evaluator must consider the type and severity of the impairment, the length of time the impairment has lasted or is expected to last, and the expected permanent and/or long-term impact of the impairment, 29 C.F.R. § 1630.2(j)(2), as well as any mitigating or corrective measures. *See Pack v. Kmart Corp.*, 166 F.3d 1300, 1305-06 (10th Cir. 1999).

In this case, Ms. Burns has failed to show she has a disability, either through evidence of a physical or mental impairment that substantially limits one or more of the major life activities; a record of such an impairment; or being regarded as having such an impairment. *Doyal,* 213 F.3d at 495. With respect to a major life activity, Ms. Burns has failed to show any inability or restriction in lifting, standing, or walking. In fact, during her interview and physical, she indicated her ability to perform such major life activities at work, and in fact, did so on numerous occasions while voluntarily performing overtime at the Mint. Even though she now complains she had difficulty walking and standing on three or four occasions during her eleven months of employment at the Mint, this is clearly insufficient to show she cannot perform these activities in the condition, manner or duration of the average person. *Doyal*, 213 F.3d at 496. Moreover,

nothing in the record shows her walking, standing and lifting problems, if any, were severe, long-term or had a permanent impact.

Second, no record of an impairment exists to show Ms. Burns suffers from the disability she claims, other than her own self-serving, contradictory, conversational declarations to other employees she had lupus, and one excuse she gave for missing work due to a "lupus flare-up." These representations are insufficient to create a record of disability sufficient to overcome summary judgment, especially when considered together with: 1) her statement on the Self-Identification of Handicap form that she had no disability; 2) an entry on her physical examination form in which she indicated she no longer suffered from lupus; 3) her statements to a supervisor and other employees at the Mint she was not sure she had lupus and that a doctor told her she did not have lupus; 4) her failure to provide medical documentation she suffered from such a condition, especially given Mr. Romero told her any future sick leave must be supported by a doctor's note; 5) her lack of such a diagnosis by the three rheumatologists who examined her on at least four occasions from 1998 to 2002; 6) her representations when applying for the position that she could perform the functions of standing and walking for eight hours and lifting twenty-eight to fifty pounds; and 7) her actual performance of those functions, together with her frequent ability to work

overtime over the course of her eleven-month probationary period. In addition, as the district court pointed out, Ms. Burns failed to provide medical or other evidence to counter the Mint's expert's opinion she did not suffer from lupus, which is only one more factor in this case which we considered in determining Ms. Burns fails to show she is a qualified individual with a disability under the ADA. Thus, contrary to Ms. Burns's contentions, her failure to survive summary judgment is not based solely on the fact she failed to provide formal medical documentation of her disability.

Nonetheless, Ms. Burns claims she gave the Mint sufficient notice of her disability by telling other employees she had lupus; and in support, relies on our decision in *Smith v. Midland Brake, Inc.*, 180 F.3d 1154 (10th Cir. 1999). However, in that case, this court discussed the interactive process which occurs after an employee provides notice of the following: 1) the disability; 2) the resulting limitations of that disability; and 3) the desire for reassignment if no accommodation is possible in the employee's existing job. *Id.* at 1171-72. We pointed out a plaintiff could only survive summary judgment by showing he or she is a disabled person within the meaning of the ADA and made her or his limitations and requests for accommodation known to the employer. *Id.* at 1179. In this case, Ms. Burns has failed, as previously discussed, to show she is disabled

under the ADA, or that she sufficiently notified the Mint of any limitations resulting from a disability, or requested an accommodation. Specifically, Ms. Burns's request for "light duty" on the mills, based solely on her self-serving, contradictory verbal declarations as to her lupus condition, without more, was insufficient to place the Mint on notice of a disability, any limitations resulting therefrom, or a request for accommodation. In addition, the record shows the two individuals who were considered over Ms. Burns for the mill position were considered more qualified based on certain legitimate scoring methods, and that the woman who was accommodated for lupus had presented the Mint with medical documentation confirming her disability.

Finally, nothing in the record shows Ms. Burns was ever regarded as having lupus. For these reasons, the district court did not err in finding Ms. Burns had not shown she suffered from a disability for the purposes of bringing a Title VII claim.

## C. Sexual Harassment

In asserting the district court erred in rejecting her sexual harassment claim, Ms. Burns suggests the totality of the circumstances shows a sufficiently severe or pervasive environment existed to make her case unsuited for summary

judgment. In support, she reiterates every fact or allegation which in any way lends support to her contentions, claiming together they show an environment replete with sexual innuendo, where her supervisors, Mr. Cruz and Mr. Romero, made it "clear to [her] that tangible job benefits would be rewarded for those who dated men in management."

> For a hostile environment claim to survive a summary judgment motion, a plaintiff must show that a rational jury could find that the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.

*O'Shea v. Yellow Tech. Servs., Inc.*, 185 F.3d 1093, 1097 (10th Cir. 1999) (quotation marks, alteration, and citations omitted). This requirement is "crucial ... to ensure that courts and juries do not mistake ordinary socializing in the workplace—such as ... horseplay or ... flirtation—for discriminatory 'conditions of employment.'" *Oncale v. Sundowner Offshore Servs. Inc.*, 523 U.S. 75, 81 (1998). "Whether an environment is 'hostile' or 'abusive' can be determined only by looking at all the circumstances ..., includ[ing] the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *O'Shea* at 1098 (quotation marks and citations omitted).

"The severity and pervasiveness of the conduct must be judged from both an objective and a subjective perspective," and "[t]he objective severity of harassment should be judged from the perspective of a reasonable person in the plaintiff's position, considering 'all the circumstances.'" *Id.* at 1097-98 (quotation marks and citation omitted). This may include "the social context in which the particular behavior occurs and is experienced by its target," and requires "[c]ommon sense, and an appropriate sensitivity to social context ... to distinguish between simple teasing ... and conduct which a reasonable person in the plaintiff's position would find severely hostile or abusive." *Oncale*, 523 U.S. at 81-82. Thus, our inquiry requires an assessment of the "real social impact of workplace behavior [based] on a constellation of surrounding circumstances, expectations, and relationships which are not fully captured by a simple recitation of the words used or the physical acts performed." *Id.* at 82.

With regard to *quid pro quo* sexual harassment, we have said that "[w]hen a plaintiff proves that a tangible employment action resulted from a refusal to submit to a supervisor's sexual demands, he or she establishes that the employment decision itself constitutes a change in the terms and conditions of employment that is actionable under Title VII." *See Smith v. Cashland, Inc.*, 193 F.3d 1158, 1160 (10th Cir. 1999). An employer may refute a *quid pro quo*

harassment claim by either proving no negative employment action took place or establishing it made the termination decision for legitimate business reasons and not because the employee refused to submit to sexual demands. *Id.*

We begin with Ms. Burns's claim on appeal that she experienced *quid pro quo* sexual harassment because her supervisors made it "clear to [her] that tangible job benefits would be rewarded for those who dated men in management." While we cannot condone any sexually-oriented or coarse comments Mint supervisors may have made to Ms. Burns, the totality of the circumstances does not show, as Ms. Burns now contends, that either of her supervisors made demands which, if she either accepted or refused, would result in a certain outcome. In other words, she has not shown she was promised tangible job benefits if she dated them or experienced reprisal when she refused to have a relationship with them. In fact, while Mr. Cruz and Mr. Romero made comments Ms. Burns believed meant they were asking her out, she admitted they left her alone when she made it clear she was not interested in dating them. She has also acknowledged Mr. Romero did not make sexually advancing or sexually harassing comments to her.

Moreover, nothing about the t-shirts Mr. Cruz gave Ms. Burns is suggestive

of any sexually-related expectation, especially given he also gave other crew members t-shirts. However, the alleged comments he made about sleeping with a supervisor to get his job when Ms. Burns asked about receiving more training on certain machines is of concern and, as Ms. Burns contends, could be construed as *quid pro quo* sexual harassment. However, in this case, it appears Ms. Burns did get the training she sought without dating Mr. Cruz, as evidenced by her withdrawal of her EEO complaint requesting training. In addition, the Mint has provided substantial evidence Ms. Burns was discharged for performance and attendance deficiencies, and not for anything involving Mr. Cruz's behavior, thereby providing legitimate and nondiscriminatory reasons for her termination. While she complains she could have performed her job better if she had timely received the training she requested, she still has not overcome the deficiencies in her attendance at a facility where attendance was critical in order to meet national production standards.

We also view Ms. Burns's supervisors' behavior in view of her more general sexual harassment claim in determining whether the circumstances presented in this case caused Ms. Burns to experience a severely hostile or abusive work environment. *See Oncale*, 523 U.S. at 81-82. The record on appeal shows Ms. Burns participated, albeit sometimes less than enthusiastically, in the

sexual banter and innuendo which she now complains detrimentally affected her, but which she has not shown affected her performance at work. In so doing, Ms. Burns admits the "vulgar" sense of humor of her co-workers "kind of rubbed off on [her]." While she complains Mr. Cruz's comment about her cleavage made her feel like "a piece of meat," she similarly told her other supervisor he had a "tight butt," evidencing her participation in the same type of sexual banter as her supervisors. While she complains Mr. Cruz discussed his sex life with her, Ms. Burns admits she also volunteered information about her own sex life, including information about her ex-husband. Equally indicative of her acquiescence in such behavior is her admission she asked Mr. Romero for a copy of raunchy jokes and then, astonishingly, passed them on to her teenage son. Viewing Ms. Burns's supervisors' conduct, together with her own behavior and the entire social context in which such conduct occurred, we believe the circumstances presented in this case did not cause Ms. Burns to experience a severely hostile or abusive work environment. *See id.* at 81-82.

Similarly, while we do not condone the viewing of pornographic materials at a government facility, we do not find the circumstances described by Ms. Burns established an environment "permeated with discriminatory intimidation, ridicule, and insult that [was] sufficiently severe or pervasive to alter the conditions of

[her] employment and create an abusive working environment." *O'Shea*, 185 F.3d at 1097 (quotation marks and citations omitted). While Ms. Burns complains about the pornographic materials she saw, she actually approached a group of men to see one of the pictures; admits some of the pictures were not offensive to her; and acknowledges she participated in their viewing, at times laughing and chuckling or making lewd and crude comments. Thus, we find Ms. Burns's own behavior indicative in defining the social context in which the particular complained-of behavior occurred, and cannot say, with respect to the viewing of the pornographic photographs, that she has shown she experienced a severely hostile or abusive work environment, given her own participation in it. *See Oncale*, 523 U.S. at 81-82.

In addition, with respect to two of the pictures Ms. Burns found offensive, she acknowledges she was never shown them again once she complained about them. Even though the Mint maintained a written sexual harassment policy and Ms. Burns had experience with the Mint's Equal Employment Opportunity Office, she admitted she never "seriously" informed anyone she was offended by any of the sexual materials. Finally, while she complains Mr. Romero was aware another employee brought pornographic material into the workplace prior to and during 1999, when Ms. Burns was employed at the Mint, Mr. Romero did verbally

counsel that employee in 1999 about his behavior, including discussion about bringing in one of the photos about which Ms. Burns now complains. Thus, under the totality of the circumstances presented in this case, we agree with the district court's assessment that insufficient evidence exists to establish conduct sufficiently severe or pervasive to alter the condition of Ms. Burns's employment and create an abusive working environment.

## D. Retaliation

Weakest of all is Ms. Burns's claim Mint employees took adverse actions against her in retaliation for her moving in with a co-employee, and her comments to the EEO counselor that she believed she was being sexually harassed because she would not give in to Mr. Cruz's or Mr. Romero's "whims," and instead moved in with Mr. Watts. Specifically, Ms. Burns claims the Mint's retaliation against her began around October, after she moved in with Mr. Watts, as evidenced by Mr. Romero's counseling of her in November about her leave issues. After she went to the EEO counselor in early December, she points out the retaliation continued because Mr. Romero met with her on December 17, 2000, to place her on a performance improvement plan, and thereafter, told her she had to bring in medical documentation for her sick leave. Ultimately, the retaliatory, adverse action of which she complains is her termination, and she contends the Mint's

reasons for discharging her are merely a pretext for discriminatory reasons. She also complains, however, that she was terminated based on her last sick leave absence, which was related to lupus, thereby also implicating a retaliation claim based on her disability.

To establish a prima facie case of retaliation under Title VII of the Civil Rights Act the employee must demonstrate: 1) she engaged in a protected employee action; 2) the employer took an adverse action either after or contemporaneous with the employee's protected action; and 3) a causal connection existed between the employee's action and the employer's adverse action. *See Dick v. Phone Directories Co.,* 397 F.3d 1256, 1267 (10th Cir. 2005) (considering retaliation claim based, in part, on hostile environment claim); *Morgan v. Hilti, Inc.*, 108 F.3d 1319, 1324 (10th Cir. 1997) (considering retaliation claim based on disability claim). "[The employee] may maintain an action for retaliation even though the conduct forming the basis of her underlying complaint was not adjudged to have violated Title VII." *Dick*, 397 F.3d at 1267.

> If the plaintiff establishes a prima facie case of ADA discrimination, the burden shifts to the employer to offer a legitimate, nondiscriminatory reason for the challenged action. ... If the defendant articulates such a reason, then the plaintiff may prove that it is merely a pretext for unlawful discrimination on the basis of her disability.

*Selenke v. Med. Imaging of Colo.*, 248 F.3d 1249, 1259 (10th Cir. 2001). "When assessing a contention of pretext, we examine the facts 'as they appear to the person making the decision to terminate [the] plaintiff,'" and "[w]e may not second guess the business judgment of the employer." *Id.* at 1261 (citations omitted).

In this case, assuming Ms. Burns engaged in a protected employee action, the record contains substantial evidence she was discharged for performance and attendance deficiencies at a facility where performance and attendance are critical in order to meet national production standards, thereby providing a legitimate and nondiscriminatory reason for her termination. Her attempts to show these reasons were merely a pretext for unlawful termination are unavailing. While Ms. Burns complains she was discharged based on her last sick leave absence, which was related to lupus, the doctor's note for that absence states it was for lesions on her feet, and does not mention lupus. Moreover, prior to this absence, Ms. Burns had already taken unscheduled leave eighteen times, and had failed to meet the 95% required production level on various coins at different times, thereby setting in motion the legitimate, nondiscriminatory reasons for her discharge.

The same is true of the disciplinary or counseling actions taken by Mr.

Romero. While they may have incidently coincided with her moving in with a co-worker and her comments to the EEO counselor about her supervisors' behavior, it is clear that prior to these events, Ms. Burns had already accumulated many instances of unscheduled leave, been tardy, and consistently failed to meet production standards. Moreover, she has not shown Mr. Romero was aware of her comments to the EEO counselor prior to the actions he took.

Consequently, Ms. Burns fails to show a causal link between her comments to the EEO counselor and the Mint disciplining her, or that her alleged disability was related to her termination. Under these circumstances, it is clear the Mint's articulated reasons for her termination were legitimate, and not mere pretext. Accordingly, the district court did not err in rejecting Ms. Burns's retaliation claim.

IV. Conclusion

For the foregoing reasons, we **AFFIRM** the district court's grant of summary judgment to the Government.

**Entered by the Court:**

**WADE BRORBY**
United States Circuit Judge