**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**FEB 16 2005**

**PATRICK FISHER**
**Clerk**

<u>PUBLISH</u>

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

PATRICK J. BACA,

       Plaintiff-Appellant,

v.

DAVID SKLAR and the BOARD OF
REGENTS OF THE UNIVERSITY OF
NEW MEXICO,

       Defendants-Appellees.

No. 04-2010

---

**Appeal from the United States District Court
for the District of New Mexico
(D.C. No. 02-1002 JB/ACT)**

---

Kathryn Hammel, The Hammel Law Firm, P.C., Albuquerque, New Mexico for
the Plaintiff-Appellant.

John M. Wells, Albuquerque, New Mexico, for the Defendants-Appellees.

---

Before **SEYMOUR**, **ANDERSON** and **LUCERO**, Circuit Judges.

---

**LUCERO**, Circuit Judge.

---

      After accusing his employer, the University of New Mexico ("University"),

of engaging in illegal financial dealings with the state Department of Health

("DOH"), Patrick Baca allegedly endured a campaign of retaliation culminating in his resignation. Baca sued the University and Dr. David Sklar, his supervisor, claiming First Amendment retaliation and discrimination based on ethnicity. The district court granted summary judgment to the defendants on all claims. We exercise jurisdiction pursuant to 28 U.S.C. § 1291 and **AFFIRM** the district court's grant of summary judgment on Baca's Title VII, § 1981, and § 1983 ethnic discrimination claims. However, we **REVERSE** the district court's grant of summary judgment on Baca's First Amendment retaliation claim.

### I

"In setting forth the facts, we view the evidence in the light most favorable to the non-moving party, as we must when reviewing a grant of summary judgment." Garrett v. Hewlett-Packard Co., 305 F.3d 1210, 1213 (10th Cir. 2002). Viewed accordingly, the record reveals the following facts.

The Center for Injury Prevention Research and Education ("CIPRE"), a subdivision of the University of New Mexico School of Medicine's Department of Emergency Medicine, hired Patrick Baca as its Program Manager on March 5, 2001. Dr. David Sklar, the Chair of the Department of Emergency Medicine, served as Baca's immediate supervisor. Baca's duties included supervising CIPRE's five full-time employees, soliciting funds, and assuring CIPRE's financial accountability.

During the first week of April 2001, Baca attended a lunch with Jamie Michael, a CIPRE employee, and Karen Gaylord, a DOH employee. At the lunch, Gaylord offered to extend a grant to CIPRE, but insisted that the bulk of the funds flow through CIPRE to (1) New Mexico Advocates for Families and Children ("NMAFC"), a non-profit organization headed by a recent DOH retiree, and (2) Dr. Sklar's girlfriend, Dr. Debra Helitzer. Baca suspected that Gaylord was attempting to skirt New Mexico's procurement law, which requires DOH to provide funds to non-profit organizations and private researchers only after a competitive bidding process, but permits DOH to disburse funds non-competitively to the University. After Baca declined the offer, Gaylord informed him that CIPRE had a similar grant in place that helped fund Michael's salary.

Baca investigated and discovered a pending amendment to a DOH contract, not yet approved by the University's controller, the funds of which would contribute to Michael's salary with the majority flowing through to NMAFC. Baca also learned that CIPRE bypassed the University procedure of requesting applications for a vacant position, and hired Michael by falsely claiming that two grantors insisted that she serve in that position.

Within a week of the lunch meeting, Baca reported Gaylord's offer to Sklar. Sklar responded, "we can't do that" (i.e., enter into such an arrangement with DOH). No further discussion ensued at that time. Several weeks later,

however, Baca raised his concerns again with Sklar and Sklar's assistant, Barbara Konrath. Konrath stated that accepting the funds would be imprudent.

Shortly after Baca's conversations with Sklar, Baca noticed that Michael and another CIPRE employee, Lynn Fullerton, began directly communicating with Sklar. Baca suspects that these conversations involved supervisory issues that Baca, not Sklar, should have handled.

In June 2001, Baca met with an individual in the University's human resources department and in July he conferred with the University's attorney. At both meetings Baca described Gaylord's offer, as well as the irregular process by which CIPRE had hired Michael. After both individuals agreed with Baca that the University should terminate Michael's employment, Baca approached Sklar and urged him to do so. Sklar refused. At about this time, Lynn Fullerton, at her request, was transferred out from under Baca's supervision. Consequently, Sklar removed $40,000 from CIPRE's budget. This money came from a grant funding Fullerton's work at CIPRE and followed her when she left. Baca expressed to Sklar his displeasure that Sklar permitted Fullerton to take the grant money with her, but found Sklar unresponsive.

Beginning in July 2001, Sklar began meeting individually with two other CIPRE employees – Norma Faries and Jonathon LaValley. On August 24, 2001, Sklar called Baca into his office to inform him that Baca was too negative in his

approach at CIPRE. Less than a week later, on August 30th, Sklar sent Baca a letter reprimanding him for publishing a vacancy announcement for a research position that stated: "Must play a positive role in an often multidisciplinary and ego-ridden environment." Contravening University procedures, Sklar failed to utilize human resources personnel in imposing this reprimand. In a separate incident in early fall, Sklar refused to allow Baca to supervise a data analyst whom Baca had recruited.

In early December 2001, Sklar initiated a complaint against Baca before the University's Office of Equal Opportunity ("OEO") claiming that female staff members reported feeling intimidated by Baca, and that Baca treated them rudely. Shortly after Sklar filed the complaint, Jonathan Armendariz in the University's dispute resolution office contacted Baca and said, "Pat, Dave Sklar is going to fire you tomorrow." Armendariz offered to mediate between Baca and Sklar and Baca agreed. At the meeting the following day, Sklar informed Baca that an OEO complaint had been filed against him (omitting that Sklar himself had filed the complaint) and that Sklar would have to fire Baca if Baca did not resign. Baca refused to resign until OEO completed its investigation.

In late January, Baca spoke with an OEO representative who informed him that there was no cause for Sklar's complaint. At this time, Baca complained to OEO about what he perceived to be Sklar's retaliation against him for disclosing

the DOH funding irregularities. To follow up this complaint, Baca filed a document with the internal audit office in early February detailing his objections to Sklar's treatment of him, and suggesting that Sklar discriminated against him based on his ethnicity. Baca is Hispanic. Shortly thereafter, Sklar once again demanded Baca's resignation and Baca refused.

Within days of this latest altercation, Armendariz called Baca and asked him to attend a mediation with Sklar. Baca volunteered to Armendariz that he wanted to leave CIPRE and that he would agree "to look for a job elsewhere." The mediation occurred on February 12, 2002. At the invitation of the mediators, Sklar was the first person to speak. He announced his intention to move Baca's office from the basement to an upper floor that housed the Emergency Medicine Department. Baca stated his refusal to move his office and said: "I want a new job, and between now and then, I want to be out of this environment. . . . I could take [one] project and work on it from my house, [with] the assistance of the employee who is hired under that grant . . . [and of] a good computer data person." When asked how long he wished to work from home, Baca responded, "until I get [a new job], because I don't want to be coerced into quitting my job." Those present expressed reluctance, to which Baca replied, "it has to work because that's what I want."

After discussing the matter, the mediators insisted that Baca agree to resign by a date certain. Baca asked if there were any alternative, and one of the mediators informed him that Baca was welcome to remain in his position, but that he would have to move to the new office in the Emergency Medicine Department. Baca then agreed to resign after six months.

Alleging that both Sklar and the University unlawfully discriminated against him based on ethnicity and that the defendants retaliated against him for exercising his First Amendment rights, Baca sued the defendants in state court, seeking damages and equitable relief under Title VII, 42 U.S.C. § 2000e-3(a); 42 U.S.C. §§ 1981 and 1983; the New Mexico Human Rights Act, N.M. Stat. Ann. § 28-1-1 et seq.; and New Mexico tort law. The defendants removed the case to federal district court and moved for summary judgment. Baca's ethnic discrimination claims were rejected by the district court's conclusion that Baca failed as a matter of law to establish a prima facie case of discrimination. On this basis, the court granted summary judgment to the defendants on Baca's Title VII, § 1981, and § 1983 discrimination claims. Furthermore, after ruling that Baca failed to create a genuine issue of fact about whether his statements substantially motivated the defendants' adverse actions, the court granted defendants' motion for summary judgment on Baca's First Amendment claim. The court remanded the remaining state law claims to state court. Baca now appeals.

## II

We review a district court's grant of summary judgment de novo, using the same standards applied by the district court. Byers v. City of Albuquerque, 150 F.3d. 1271, 1274 (10th Cir. 1998). We view the evidence and reasonable inferences drawn from the evidence in the light most favorable to the nonmoving party. Id. Courts may grant summary judgment only where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). Mere allegations unsupported by further evidence, however, are insufficient to survive a motion for summary judgment. Dep't of Commerce v. United States House of Representatives, 525 U.S. 316, 329 (1999). "[W]e may affirm the district court for any reason supported by the record." Amro v. The Boeing Co., 232 F.3d 790, 796 (10th Cir. 2000).

## A

Finding that Baca failed to establish a genuine issue of material fact as to whether he was constructively discharged, the court below concluded that Baca failed as a matter of law to demonstrate a prima facie case of discrimination. We agree with the district court's conclusion and affirm its grant of summary judgment to the defendants on Baca's Title VII claim.

Rather than presenting direct evidence of discrimination, Baca attempted to establish his employment discrimination claim under the burden shifting framework of McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973).[1] Under this framework, a plaintiff in a wrongful termination suit establishes a prima facie case of discrimination by showing that: (1) he belongs to a protected class; (2) he was qualified for the job; (3) despite his qualifications, he was discharged; and (4) the job was not eliminated after his discharge. Perry v. Woodward, 199 F.3d 1126, 1138 (10th Cir. 1999).

A plaintiff may satisfy the third prong by demonstrating that he was constructively discharged. "The bar is quite high in such cases: a plaintiff must show he had no other choice but to quit." Garrett, 305 F.3d at 1221. When examining a constructive discharge claim, we disregard both the employee's subjective view of the workplace environment and the employer's subjective intentions regarding the employee. See Jeffries v. Kansas, 147 F.3d 1220, 1233 (10th Cir. 1998). "If an employee resigns of her own free will, even as a result of

---

[1] Baca presumably could have argued that he suffered mixed-motive discrimination and urged the court to analyze his claim under Price Waterhouse v. Hopkins, 490 U.S. 228 (1989). He did not raise this theory either below or in his briefs before us. Accordingly, we will review his claims under McDonnell Douglas. In re Walker, 959 F.2d 894, 896 (10th Cir. 1992) (except in extraordinary circumstances, this court will not consider an issue that was not before the trial court); State Farm Fire & Cas. Co. v. Mhoon, 31 F.3d 979, 984 n.7 (10th Cir. 1994) (failure to raise an issue in the opening appellate brief waives that issue).

the employer's actions, that employee will not be held to have been constructively discharged." Id.

Because Baca resigned from his position at CIPRE, he must raise a genuine issue of material fact about whether he was constructively discharged to survive summary judgment on his Title VII claim. Baca claims that the following actions created an environment where Baca had no choice but to resign: (1) Sklar writing a letter of reprimand in response to Baca's vacancy announcement; (2) Sklar meeting individually with CIPRE employees; (3) Sklar removing Baca's supervisory responsibilities over Lynn Fullerton, at her request, and permitting her to take $40,000 in grant money with her; (4) Sklar refusing to terminate Jamie Michael; (5) Sklar filing an OEO charge against him; (6) Sklar requesting Baca's resignation on at least two occasions; and (7) Sklar threatening to move Baca's office and to continue to deprive him of meaningful supervisory responsibilities. Baca's repeated rebuffs of Sklar's attempts to secure his resignation, coupled with his successful negotiation of separation terms, belies Baca's argument.

Although Sklar requested Baca's resignation on at least two occasions, Baca refused both times. First, in early December 2001, Sklar asked Baca to resign in light of the OEO charges filed against him. Baca declined and insisted on waiting for OEO to complete its investigation. Second, Sklar requested Baca's resignation in late January, at which point Baca accused Sklar of behaving

unethically and stated that he would not speak with Sklar without a third-party present; Sklar left Baca's office. Apparently on these two occasions Baca did not feel that he had no choice but to resign.

When Jonathan Armendariz requested that Baca attend a mediation on February 12, 2002 to resolve his dispute with Sklar, Baca volunteered that he wanted to leave CIPRE and "look for a job elsewhere." At the meeting, Baca was the first to suggest that he end his employment with CIPRE by declaring, "I want a new job, and between now and then, I want to be out of this environment . . . ." He demanded that the University pay him to work from home until he obtained new employment, because he did not "want to be coerced into quitting [his] job," and insisted that "it has to work because that's what [he] want[s]." Baca rejected the University's offer of continued employment, with the caveat that he move his office, in favor of a deal that compensated him for six months while he searched for another position.[2]

We faced similar facts in a recent case. In Exum v. United States Olympic Comm., 389 F.3d 1130 (10th Cir. 2004), the Director of Drug Control Administration for the U.S. Olympic Committee ("USOC") sued his former

---

[2] Baca argues that working from home on a single project without supervisory responsibilities constituted a "demotion," which is an adverse employment action distinct from wrongful termination. Baca did not raise this argument below and we decline to address it here.

employer alleging racial discrimination and claiming that he was constructively discharged. The plaintiff alleged that after he refused to comply with an unethical order, his supervisor told him that he "could leave the USOC 'sooner rather than later.'" Id. at 1133. In response, the plaintiff resigned stating that he was resigning "under duress and protest" because of the USOC's unethical activities and its hostility toward racial minorities. Id. The next day, the USOC responded with a letter offering alternatives to resignation. On appeal, we held that to establish constructive discharge a "Plaintiff must show that, at the time of his resignation, his employer did not allow him the opportunity to make a free choice regarding his employment relationship." Id. at 1135 (citations omitted). Because "the USOC provided [plaintiff] with alternatives to quitting, . . . [but] [d]espite these options, Plaintiff insisted upon terminating his employment relationship with the USOC," we concluded that the plaintiff failed to demonstrate that he was constructively discharged. Id. at 1136.

Here, the defendants offered Baca continued employment, and, after he rejected that offer, they continued to compensate him for six months before he actually resigned. Accordingly, we cannot conclude that Baca did not have "a free choice regarding his employment relationship." Id. at 1135. The defendants offered him a choice, and that choice would by no means have subjected him to an "objectively intolerable" working environment. Sanchez v. Denver Pub. Sch.,

164 F.3d 527, 534 (10th Cir. 1998). Although his sour relationship with Sklar may have made quitting Baca's best option, Baca has not presented a genuine issue of material fact as to whether "he had no other choice but to quit," Garrett, 305 F.3d at 1221, and therefore felt "compelled to resign." Yearous v. Niobara County Memorial Hosp., 128 F.3d 1351, 1356 (10th Cir. 1997). We therefore agree with the district court's determination that Baca failed as a matter of law to demonstrate a prima facie case of discrimination and affirm its grant of summary judgment for the defendants on Baca's Title VII claim.[3]

**B**

Baca claims that the defendants retaliated against him for engaging in four categories of speech: (1) statements regarding the procurements, grants, and

---

[3] "[I]n racial discrimination suits, the elements of a plaintiff's case are the same . . . whether that case is brought under §§ 1981 or 1983 or Title VII." Drake v. Ft. Collins, 927 F.2d 1156, 1162 (10th Cir. 1991); see also Patterson v. McLean Credit Union, 491 U.S. 164, 186-87 (1989) (applying McDonnell Douglas framework to § 1981 suit); Kendrick v. Penske Transp. Servs., 220 F.3d 1220, 1226 n.4 (10th Cir. 2000) ("A plaintiff who alleges discriminatory discharge on the basis of race pursuant to Title VII, 42 U.S.C. § 1983, or § 1981 would have to establish the same elements in order to make out a prima facie case under the McDonnell Douglas burden-shifting analysis."). Therefore, Baca's §§ 1981 and 1983 racial discrimination claims fail for the same reason that his Title VII claim fails, and accordingly we affirm the district court's dismissal of Baca's §§ 1981 and 1983 claims.

contracts with DOH; (2) statements regarding the irregular process by which CIPRE hired Jamie Michael; (3) complaints about discrimination; and (4) allegations of retaliation. Concluding that Baca engaged in the latter two categories of speech solely out of personal motivation, and that Baca did not suffer adverse employment actions in response to the first two categories of speech, the district court granted summary judgment to the defendants on Baca's First Amendment retaliation claim.

The Supreme Court has held that the First Amendment protects statements by public employees even when such statements are directed at their employer, but only when the statements relate to matters of public concern. See Pickering v. Board of Educ., 391 U.S. 563 (1968). Since then, we have applied the Pickering test to ascertain whether an employment action impermissibly infringes on an employee's First Amendment rights.

Under this test, the employee must show that (1) the speech in question involves a matter of public concern; (2) his interest in engaging in the speech outweighs the government employer's interest in regulating it; and (3) that the speech was a substantial motivating factor behind the government's decision to take an adverse employment action against the employee. See Horstkoetter v. Dep't of Pub. Safety, 159 F.3d 1265, 1271 (10th Cir. 1998). If an employee proves these three factors, then he must prevail unless the employer proves "by a

preponderance of the evidence that it would have reached the same decision . . . even in the absence of the protected conduct." Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle, 429 U.S. 274, 287 (1977). The first two factors are questions of law for the court to decide; the third prong is a fact question for the jury. See Bass v. Richards, 308 F.3d 1081, 1088 (10th Cir. 2002).

Because it found that Baca complained about discrimination and retaliation solely for personal reasons, and not to expose his employer's wrongdoing to public scrutiny, the district court concluded that these areas of speech did not involve matters of public concern. An employee's motivation for speaking is important to our analysis of whether the speech pertained to matters of public concern. Lighton v. Univ. of Utah, 209 F.3d 1213, 1224 (10th Cir. 2000) ("In analyzing whether speech constitutes a matter of public concern, we may focus on the motive of the speaker and whether the speech is calculated to disclose misconduct or merely deals with personal disputes and grievances unrelated to the public's interest."); Schalk v. Gallemore, 906 F.2d 491, 495 (10th Cir. 1990) ("we have looked to the subjective intent of the speaker"). Baca complained of discrimination only after Sklar had reprimanded him, lodged an OEO complaint against him, and demanded his resignation, and within weeks of negotiating separation terms. The record demonstrates that Baca raised allegations of discrimination and retaliation to undermine Sklar's accusations against Baca, and

not to publicly disclose illegal behavior. As such, Baca's statements regarding discrimination and retaliation pertained to a "personal dispute[] and grievance[] unrelated to the public's interest," Lighton, 209 F.3d at 1224, and therefore do not merit First Amendment protection.

Turning to Baca's statements regarding CIPRE's financial relationship with DOH and its hiring of Jamie Michael, the district court assumed without deciding that such comments involve matters of public concern. We look to the content, form, and context of an employee's statement to determine if it pertains to a matter of public concern. Connick v. Myers, 461 U.S. 138, 147-48 (1983). In terms of content, Baca's repeated remarks alleged illegal financial dealings between a state university and a state agency. We have held that statements revealing official impropriety usually involve matters of public concern. See Lighton, 209 F.3d at 1224-25 ("when the identified speech focuses on disclosing a public official's malfeasance or wrongdoing, it is most likely a matter of public concern."). Accordingly, the content of Baca's speech supports our conclusion that it involves a matter of public concern.

Furthermore, the form and context of Baca's speech reveal that Baca did not seek personal advantage by raising allegations of wrongdoing, but rather that he intended to vindicate the public interest. Baca first confronted Sklar, his supervisor, after occupying his position for only a month and while relations were

- 16 -

amicable between them, and brought to Sklar's attention potentially illegal dealings that benefitted Sklar's girlfriend. Baca also implicitly accused Sklar of violating University regulations through CIPRE's hiring of Jamie Michael. Having received an unsatisfactory response, Baca again raised the issue with Sklar, this time in the presence of Sklar's assistant. Only then did Baca present his allegations to individuals outside of CIPRE, and all persons with whom Baca spoke occupied University positions relevant to Baca's complaint. Baca raised his concerns in a manner reasonably calculated to compel CIPRE's compliance with the law and in a context where speaking up would not likely benefit him. On this background, it would strain credulity to suggest that Baca's statements regarding CIPRE's dealings with DOH and its hiring of Jamie Michael do not involve a matter of public concern.

Our next step in applying the Pickering test is to weigh Baca's interest in speaking against his employer's interest in regulating his speech. The district court assumed without deciding that Baca's interest outweighs his employer's interest. A public employer's interest in regulating its employees' speech relates to its interest, "as an employer, in promoting the efficiency of the public services it performs through its employees." Pickering, 391 U.S. at 568. Baca's statements alleged that his employer was engaging in grossly inefficient and unethical behavior, namely, assisting a state agency in avoiding bidding

- 17 -

requirements, hiring an unqualified employee at a pay grade exceeding her experience, and accepting public funds in exchange for serving as a flow-through organization for DOH grants. As such, the University's interest in regulating Baca's speech was minimal. Conversely, as the manager of an organization possibly engaged in illegal activity, Baca had a great interest in curtailing the suspected wrongdoing. Accordingly, we conclude that Baca's interest in speaking outweighs the defendants' interest in regulating his speech.

Because we have determined, as a matter of law, that Baca's speech satisfies the first two prongs of the Pickering test, his statements regarding CIPRE's financial dealings with DOH and its hiring of Jamie Michael deserve First Amendment protection. We now turn to Pickering's third prong, under which Baca must establish genuine issues of material fact as to whether his protected speech substantially motivated CIPRE to take adverse employment actions against him. Concluding that (1) only Sklar's reprimand of Baca concerning the vacancy announcement could constitute an adverse employment action, and (2) Baca failed to demonstrate that this reprimand and his protected speech were causally related, the district court granted summary judgment to the defendants on Baca's retaliation claim. The court erred on both points.

We address first the district court's conclusion regarding the adverse employment actions that Baca allegedly suffered. An employee alleging

- 18 -

retaliation must show that his employer took some adverse employment action against him. See Belcher v. City of McAlester, 324 F.3d 1203, 1207 n.4 (10th Cir. 2003) ("Implicit in the Pickering test is a requirement that the public employer have taken some adverse employment action against the employee."). Although we have never delineated what actions constitute "adverse employment actions" in the First Amendment context, we have repeatedly concluded that a public employer can violate an employee's First Amendment rights by subjecting an employee to repercussions that would not be actionable under Title VII. See, e.g., Morfin v. Albuquerque Public Schools, 906 F.2d 1434, 1437 n.3 (10th Cir. 1990) (rejecting proposition that "only adverse employment decisions, such as termination, suspension, or transfer, in retaliation for constitutionally protected conduct are illegal. Actions short of an actual or constructive employment decision can in certain circumstances violate the First Amendment."); Schuler v. City of Boulder, 189 F.3d 1304, 1310 (10th Cir. 1999) (reprimanding employee, transferring her to another location, and removing job duties from her constitute adverse employment actions in First Amendment context).

Baca argues that Sklar retaliated against him by removing his supervisory responsibilities over Lynn Fullerton, depriving Baca of the opportunity to supervise a data analyst whom Baca had recruited, encouraging CIPRE employees to bypass Baca and receive direct supervision from Sklar, reprimanding Baca in

contravention of university protocol, and filing an OEO charge against Baca and then using that charge to demand Baca's resignation. These allegations, if true, could be found to constitute adverse employment actions in the First Amendment context.

Once an employee establishes that his employer subjected him to adverse employment actions, under the <u>Pickering</u> test's third prong, the employee must also demonstrate that his protected speech substantially motivated the employer to administer such adverse consequences. The district court erred in concluding that the adverse employment actions and Baca's statements were unrelated. Baca alleges that Sklar began to retaliate against him within a week of Baca confronting Sklar about DOH's potentially illegal dealings with CIPRE. Specifically, Baca alleges that within a week of his conversation with Sklar regarding DOH's funding practices, Sklar began undermining Baca's authority by meeting directly with CIPRE employees and encouraging them to ignore Baca's attempts at supervision. This, Baca alleges, began a pattern of retaliation culminating in Baca's resignation.

Although "protected conduct closely followed by adverse action may justify an inference of retaliatory motive," <u>Marx v. Schnuck Mkts.</u>, 76 F.3d 324, 329 (10th Cir. 1996), "[t]he mere temporal proximity of Plaintiff's protected speech to [the adverse action] is insufficient, without more, to establish retaliatory motive."

Butler v. City of Prairie Village, 172 F.3d 736, 746 (10th Cir. 1999). We have not clarified what a plaintiff must show beyond temporal proximity to establish a retaliation claim, but we have considered as relevant whether the protected speech implicated the individual defendant in wrongdoing. See id. Here, Baca's speech involved allegations that CIPRE, under Sklar's watch, assisted a state agency in violating the law by funneling money to Sklar's girlfriend, and, furthermore, that CIPRE fraudulently misrepresented to the Dean of the Medical School that two grantors requested that CIPRE hire Jamie Michael. These allegations, if true, certainly implicate Sklar in misconduct. Whether Sklar subjected Baca to adverse employment actions soon after Baca engaged in protected speech, and whether Sklar did so to retaliate against Baca, are questions properly left for the jury. Baca has raised genuine issues of material fact on this point sufficient to withstand summary judgment.

If Baca demonstrates at trial that his speech substantially motivated the defendants to take an adverse employment action against him, he must prevail unless the defendants prove by a preponderance of the evidence that they would have taken the same action in the absence of Baca's speech. The court below concluded that even if Baca met all three Pickering factors, that "Baca has offered no evidence that the Defendants would have acted differently in the absence of his speech." Baca v. Sklar, No. CIV-02-1002, slip op. at 25 (D. N.M. 2004). In

so finding, the court misapplied our precedent. It does not fall to the plaintiff, as the nonmovant on summary judgment, to demonstrate that the defendant would have acted differently absent the plaintiff's protected speech. Once a plaintiff demonstrates that his protected speech substantially motivated the employer's adverse action, he has met his burden. "[T]he burden then shifts to the employer to show by a preponderance of the evidence that it would have reached the same decision" regardless of the employee's statements. Ballard v. Muskogee Regional Med. Ctr., 238 F.3d 1250, 1252 (10th Cir. 2001). Given that the defendants have not yet attempted to meet their burden, it was error for the court below to require Baca to create a fact issue on this point. Nonetheless, we note that the facts supporting Baca's claim with respect to Pickering's third prong suffice to create a fact issue about whether the defendants would have reached the same decision regardless of his statements.

In summary, because Baca's statements concerning discrimination and retaliation were personally motivated and did not involve matters of public concern, the district court properly concluded that such statements do not merit First Amendment protection. However, Baca's statements regarding CIPRE's financial dealings with DOH and its hiring of Jamie Michael do constitute protected speech, and Baca has created a genuine issue of material fact as to whether the defendants subjected him to adverse employment actions because of

- 22 -

these statements.  Accordingly, we reverse the district court's grant of summary judgment to the defendants on Baca's First Amendment retaliation claim.[4]

### III

We **AFFIRM** the district court's grant of summary judgment to the defendants on Baca's Title VII and §§ 1981 and 1983 discrimination claims.  We **REVERSE** the district court's order granting summary judgment to the defendants on Baca's First Amendment retaliation claim and **REMAND** for further proceedings.

---

[4] After granting summary judgment to the defendants on all of Baca's federal law claims, the district court remanded the remaining state law claims to state court.  Because we remand Baca's First Amendment retaliation claim, the district court should reconsider its decision to decline supplemental jurisdiction over Baca's state law claims.