BRISCOE, Circuit Judge,
dissenting.
In my view, plaintiffs have presented sufficient material facts to withstand summary judgment on their First Amendment claims. That is, unlike the majority, my review of the record under the relevant summary judgment standards leads me to the conclusion that plaintiffs have produced sufficient evidence to establish their employer’s adverse employment actions were in direct response to their prior protected speech. ' I therefore dissent.
We review the district court’s grant of summary judgment de novo, applying the same legal standard used by the district court. Simms v. Okla. ex rel. Dep’t of Mental Health & Substance Abuse Servs., 165 F.3d 1321, 1326 (10th Cir.1999). Summary judgment should be granted “if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.” Fed. R.Civ.P. 56(c). In applying this standard, we are to review the evidence and draw reasonable inferences therefrom in the light most favorable to the nonmoving party. Simms, 165 F.3d at 1326. Further, in First Amendment cases, “an appellate court has an obligation to make an independent examination of the whole record in order to make sure that the judgment does not constitute a forbidden intrusion on the field of free expression.” Schalk v. Gallemore, 906 F.2d 491, 494 (10th Cir.1990) (internal quotation omitted).
Viewing the record in the light most favorable to the plaintiffs, the following chronology of events becomes evident. In December 2001, a local television news team. appeared at SWMD to interview Pratt regarding information the news team had received from Maestas and Hort about mismanagement and governmental waste. The information consisted of a packet of internal memorandums between Pratt, Maestas, and Hort.
Pratt realized it was Maestas and Hort who provided this information to the media and, within a month, Pratt recommended *1193 the elimination of their positions. In the months following Pratt’s recommendation, Maestas and Hort complained publicly about problems with SWMD and what they viewed as the retaliatory elimination of their positions. During this same period, Pratt and Segura continued to pursue the elimination of Maestas’ and Hort’s positions. Pratt and Segura eventually proposed a budget that removed funding for Maestas’ and Hort’s positions.
Maestas and Hort allege Pratt was also aware they were the persons who provided information to internal auditors regarding mismanagement of SWMD. As a result of the information Maestas and Hort provided, an internal auditor (Rick Williams) sent a series of letters to Pratt regarding the concerns raised by Maestas and Hort. Although Maestas acknowledges he was not directly threatened by Pratt or Segura for providing information to the City’s internal auditors, he alleges that Pratt’s threats were conveyed to him by Frank Ortega.
In response to audit inquiries from Williams in March of 2002, Maestas was called into a meeting with another SWMD official and was told that Segura did not want Maestas to provide any additional information to internal audit. In March or April 2002, Segura spoke with and directly criticized Maestas, who was quoted in a newspaper story, for speaking to the media before talking to him about concerns with the department.
After learning their positions were being eliminated' and they were in danger of being laid-off, Maestas and Hort communicated with members of the city council, city administrators, the district attorney’s office, and by a letter sent to Segura in January 2002. In their January 25, 2002, letters and in Maestas’ letter to the city council, Maestas and Hort raised the same concerns they had previously raised, i.e., serious mismanagement of SWMD, governmental waste, and retaliation against them for publicly raising these problems.
At a meeting of the city' council on April 9, 2002, the council rejected the recommendations of Pratt and Segura to eliminate the plaintiffs’ positions and instead re-appropriated funding for those positions. At this council meeting, Maestas described Pratt and Segura’s activities as the “Solid Waste Enron.” A week after the city council meeting, Pratt and Segura transferred Hort and Maestas to other jobs. On April 16, 2002, Maestas was removed from his job as vehicle maintenance materials manager and transferred to a previously non-existent unit where he would supervise the inventory of trash carts and bins. On April 16, 2002, Hort was transferred from his position as a supervisor of mechanics to a job as a supervisor of graffiti removal.
Defendants allege that plaintiffs’ positions were eliminated due to budget cuts. Maestas and Hort contend, however, that budget cuts were not the reason behind the elimination of their positions. They cite the city’s published budget ■ (Exhibit P)[1] and note that the approved budget for 2002 SWMD did not decrease, but in fact *1194 increased by more than $1,500,000.00. The SWMD approved budget for 2003 also provided for a spending increase of an additional $1,500,000, rather than a budget cut. Although the estimated actual budget decreased between 2001 and 2002, the decrease in budget affected only the costs for operating, transfers, and grants. The budget for personnel costs was not reduced, but actually increased by almost $500,000 in 2002.
The district court found support for the defendants’ budgetary reasons for elimination of Maestas’ and Hort’s positions by concluding the 2002 fiscal year budget revealed a mid-year revenue shortfall. However, the budget in question specifically referenced other actions that were taken to address the ■ shortfall, i.e. recycling was to be picked up every other week, as opposed to every week, and several major purchases were delayed to maintain a sufficient working capital balance. Thus, according to the City’s budget, these 2002 mid-year shortfalls were addressed in other ways which did not include the elimination of positions.
In support of their decisions to transfer Maestas and Hort to other positions, defendants indicate they were simply trying to make the best use of the plaintiffs’ employment. Defendants contend Maes-tas was transferred because an internal audit indicated it had been ten years since the last physical count of sanitation department carts and bins. However, as noted by Maestas and Hort, this audit was from the year 2000. Thus, between November of 2000 and April 15, 2002, no action was taken to inventory carts and bins, but within one week of the April 9, 2002, City Council meeting, Segura reassigned Maestas from his position as a materials manager in vehicle maintenance to supervising a unit created that same day which was allegedly responsible for the inventory of carts and bins. The lack of clarity concerning Maestas’ new duties also erodes, the defendants’ alleged justification for the transfer. For example, even though the alleged need for Maestas’ transfer was to perform an inventory of residential and commercial carts and bins, Maestas’ actual duties were limited to only residential carts. Maestas also states that after his reassignment no inventory was actually performed.
Defendants contend Hort was transferred because Mayor Chavez made cleaning up graffiti a priority of his administration, and Hort had supervisory skills. Again, however, the sequence of events is important. Within a week after the April 9, 2002, City Council meeting, Hort was transferred into this position. As emphasized by Maestas and Hort, although graffiti clean-up was a priority for Mayor Chavez, the position remained vacant for approximately four months following Chavez’s entry into office in December 2001.
*1195 Defendants also contend Hort was transferred because he was the supervisor with the lowest seniority in vehicle maintenance. Hort, however, contends that under departmental seniority rules and based on experience that he is not the person who should have been transferred. Art Torres actually had less seniority than Hort. Pratt asserted that Torres had already left the vehicle maintenance division, but conceded that he remained within the department.
Based on this evidence, a reasonable jury could conclude that the plaintiffs’ protected speech was a substantial motivating factor for Pratt’s and Segura’s threat to eliminate the plaintiffs’ positions, their budget proposal to eliminate the plaintiffs’ positions, and their transfer of the plaintiffs from positions which would enable them to gain information and report concerning Segura’s and Pratt’s activities related to the SWMD’s truck and tire contracts.[2]
For these reasons, I would reverse the district court’s grant of summary judgment on plaintiffs’ First Amendment claims and remand for further proceedings.

. The defendants argued in their reply brief to the trial court that Exhibit P, the city’s published budget, was inadmissible and thus could not be considered for purposes of summary judgment. The district court agreed, deeming the exhibit inadmissible because it was unauthenticated and contained hearsay. The exhibit, however, should have been admitted in my view. The exhibit, which is part of the City's published budget that was produced by the government upon a discovery request by the plaintiffs, falls within a number of exceptions to the hearsay rule and is prop *1194 erly authenticated for purposes of summary judgment analysis. For example, the budget falls within the hearsay exception provided under Federal Rule of Evidence 803(8) for public records and reports. Also, the budget is authenticated as a document produced through a discovery request and as a self-authenticating official publication under Federal Rule of Evidence 902(5). In response to an argument that a letter written by an individual to Phil Donahue should not be considered in the court’s summary judgment analysis because it was unsupported by a sworn affidavit, this court concluded that the letter was admissible because it was obtained through a request for the production of documents. Anderson v. Cramlet, 789 F.2d 840, 845 (10th Cir.1986). Similarly, the City's budget should have been deemed authenticated as an official published document produced in response to a discovery request.

. The majority in footnote 5 states that “[u]n-like the Seventh Circuit, we have never held employment action which may tend to chill free speech is necessarily adverse.” The majority cites Baca v. Sklar, 398 F.3d 1210, 1220 (10th Cir.2005), wherein we noted the following: "Although we have never delineated what actions constitute 'adverse employment actions’ in the First Amendment context, we have repeatedly concluded that a public employer can violate an employee's First Amendment rights by subjecting an employee to repercussions that would not be actionable under Title VII." Ultimately, the majority concludes that because this case is resolved upon another ground, it is unnecessary to determine whether this court should adopt the tendency to chill free speech standard of the Seventh Circuit. Adding to the dicta, I note that this court stated in Belcher v. City of McAlester, Oklahoma, 324 F.3d 1203, 1207 n. 4 (10th Cir.2003) the following: "In reprimanding Belcher, the fire department chilled any future attempts to contact Council members outside of a public meeting. We conclude that this chilling effect is real, and that Belcher has shown that he was subject to adverse employment action as a result of his speech.” Belcher appears to be relevant to determining whether the chilling of free speech standard of the Seventh Circuit is applied in this circuit.