**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**March 6, 2007**

**Elisabeth A. Shumaker**
**Clerk of Court**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**

---

JAMES BOLTON,

      Plaintiff-Appellant,

v.

SPRINT/UNITED MANAGEMENT
COMPANY,

      Defendant-Appellee.

No. 06-3042
(D.C. No. 04-CV-2156-CM)
(D. Kan.)

---

**ORDER AND JUDGMENT**[*]

---

Before **HOLMES**, **McKAY**, and **BRORBY**, Circuit Judges.

---

Plaintiff James Bolton appeals from the district court's entry of summary

judgment in favor of defendant Sprint/United Management Company (Sprint) on

Mr. Bolton's claim of employment discrimination under the Age Discrimination

in Employment Act, 29 U.S.C. §§ 621-634 (ADEA). We have jurisdiction under

28 U.S.C. § 1291 and affirm.

---

[*]    After examining the briefs and appellate record, this panel has determined
unanimously that oral argument would not materially assist the determination of
this appeal. *See* Fed. R. App. P. 34(a)(2); 10th Cir. R. 34.1(G). The case is
therefore ordered submitted without oral argument. This order and judgment is
not binding precedent, except under the doctrines of law of the case, res judicata,
and collateral estoppel. It may be cited, however, for its persuasive value
consistent with Fed. R. App. P. 32.1 and 10th Cir. R. 32.1.

## I. Background

Mr. Bolton was born on February 5, 1953, and began working for Sprint's predecessor in 1987 as a software engineer II. In 1990, he began working part-time on the Access Request Management System (ARMS), an on-line system that field representatives use to enter service requests. In 1993, he began working full time on the ARMS team. Mr. Bolton worked on that team until his discharge in October 2003.

During the course of his employment, Mr. Bolton received performance evaluations by his manager for each performance year. For performance years 1990 through 1998, he received generally favorable overall ratings of "proficient," "above expectations," or "fully met expectations." He was promoted to software engineer III (SE III) in 1995 by his manager, Betty Mathis, although against her better judgment. Aplt. App., Vol. I at 114, ¶ 9. Mr. Bolton received pay raises each year from 1990 through 1997.

The reviews for performance years 1996 and 1998, however, were not without some comment on Mr. Bolton's performance problems. Despite rating him as "fully satisfactory" (a middle rating of "3" on a scale of "1" to "5," with "5" being the lowest) for performance year 1996, Ms. Mathis rated him as "improvement needed" in the areas of leadership, management, and personal effectiveness, *id.* at 113, ¶ 5; *id.* at 244. She based her appraisal of his weaknesses on her observation that he had a difficult time grasping new tasks,

took longer than average to perform a task, had very weak analytical skills, lacked an understanding of basic ARMS business functions despite the length of time he had worked on the ARMS team, and was either very conservative or lacking in self-confidence in decision-making skills. *Id*. at 113, ¶ 7.

Sue Goodwin took over as manager of the ARMS team in March 1998 and became Mr. Bolton's direct supervisor. When she met with Mr. Bolton in early 1999 to discuss his 1998 performance, she explained that although he was dedicated, tried hard, and was well-liked, he was not performing at the level of an SE III for a number of reasons, including his inability to provide technical guidance to less experienced engineers, his need for continuous guidance on how to solve most production problems, his difficulty writing adequate technical specifications, and his lack of organization. *Id*. at 339. Despite considering a rating of "4," Ms. Goodwin gave him the higher rating of "3" but did not award a merit-based pay increase. *Id*. at 341. Ms. Goodwin again rated him as a "3" for 1999. *Id*. at 257.

Thereafter, Ms. Goodwin solicited and received comments from team leads under whom Mr. Bolton worked that reiterated many of the same performance shortcomings Ms. Mathis and Ms. Goodwin had noted. These problems caused Larry Reeves, one of Mr. Bolton's team leads, to give him the easiest tasks in order to avoid spending time fixing errors. *Id*. at 306:9-17. When Ms. Goodwin met again with Mr. Bolton in July 2000, she indicated that his need for

continuous, substantial support should not be required of an SE III with as many years experience on the same system. *Id.* at 356. For performance year 2000, Ms. Goodwin again rated Mr. Bolton a "3," "fully met expectations," noting that he was a team player and completed his assignments but continued to require assistance from other team members. *Id.* at 267. Mr. Bolton received another pay increase.

Sprint employed two rating systems for performance year 2001, the old system under which it awarded a formal numerical rating and a new, letter-based system under which it awarded an "advisory rating" of Most effective (M), Highly effective (H), Effective (E), Improvement needed (I), or Substantial Improvement needed (SI). Sprint directed its managers to use a bell curve system and classify a certain percentage of employees at each of the advisory levels, with the largest percentage, 40%, rated "E." Mr. Bolton was rated a "3" on the formal scale ("fully met expectations"), *id.* at 279, an "E" on the advisory scale, and received a pay increase.

For performance year 2002, Sprint used only a four-tiered letter-based scale, Most effective (M), Highly effective (H), Very effective (V), or Less effective (L), and Sprint again employed the bell curve system. Ms. Goodwin received additional reports from other ARMS team members concerning Mr. Bolton's performance problems, which were similar to those described above. She rated him an "L" and wrote that he takes longer to accomplish tasks than any

-4-

other SE III on the ARMS team despite being the longest-tenured member. *Id.* at 293-94.

In January and February 2003, Shelly Becker was Mr. Bolton's team lead and gave him two project evaluations. Although she found Mr. Bolton to be a conscientious worker who did whatever was needed to meet deadlines, she stated that he needed to have greater self-confidence and provide quicker code turnaround, and that he struggles with many areas of ARMS. *Id.* at 369-70, 372-73.

In March 2003, Sprint added a layer of supervision to the ARMS team between Ms. Goodwin and the team members, and Ms. Becker became Mr. Bolton's supervisor. Ms. Becker testified that while she was Mr. Bolton's supervisor, no one on the ARMS team took consistently longer to complete tasks than Mr. Bolton did. *Id.* at 166:3-6.

In May 2003, Ms. Goodwin conducted an informal assessment of Mr. Bolton's knowledge and skills and, more specifically, his demonstration of "Sprint Dimensions." Among the factors identified as Sprint Dimensions were (1) Leadership, and (2) Personal Effectiveness. Mr. Bolton received the same poor score in both areas—a "4," which was one step from the bottom of a five-point scale. Approximately one month later, Ms. Becker conducted a similar informal assessment of all of the members of the ARMS team. As to Leadership

and Personal Effectiveness, Mr. Bolton fared no better on Ms. Becker's assessment; as to both, he received a "4."[1]

In late May 2003, Patricia Mitchell, then fifty-eight years old, evaluated Mr. Bolton's performance on a project she led. Although omitted from her initial written evaluation, Ms. Mitchell eventually documented certain performance problems that she had only discussed with Mr. Bolton, in order to address the

---

[1]     Mr. Bolton's briefs on these factual matters are confusing and his citations to the record are unhelpful. In his opening brief, he states that Ms. Becker's evaluation occurred first, *see* Aplt. Opening Br. at 10, but a chart in that brief suggests the opposite, *see id.* at 11-12, as does the discussion and the same chart in his reply brief, *see* Aplt. Reply Br. at 13-14. His supporting citations to the record refer to a chart in the brief he filed in the district court in response to Sprint's motion for summary judgment, *see* Aplt. App., Vol. II at 443-44, which is identical to the chart in his appellate briefs, and to a barely-legible document that appears to evaluate Mr. Bolton and other ARMS team members on the "Sprint Dimensions," *see id.* at 716, which he attributed to Ms. Goodwin in his opening brief and to Ms. Becker in his reply. The chart indicates that both Ms. Goodwin and Ms. Becker gave Mr. Bolton a "4" on Leadership and Personal Effectiveness. The cited document at page 716 of the record appears to rate Mr. Bolton a "4" in Leadership and Personal Effectiveness, but it is unclear from the document itself who completed it or when it was completed, and we have found no documentation of a second evaluation. Although Ms. Becker's deposition testimony indicates that she gave Mr. Bolton a "4" on Leadership, *id.* at 689:6-7, and that her evaluation was dated June 16, 2002, *see id.* at 691:18 to 692:24, she never states what rating she gave Mr. Bolton on Personal Effectiveness. Fortunately, for our purposes, we need not resolve this morass because the parties do not appear to dispute that both Ms. Goodwin and Ms. Becker completed an informal evaluation and both scored Mr. Bolton a "4" on Leadership and Personal Effectiveness. The sequence of their evaluations is immaterial.

concern of Ms. Goodwin and Ms. Becker that all problems be documented. *Id.* at 164:12-20.[2]

In June 2003, Ms. Goodwin and Ms. Becker talked to Mr. Bolton about applying for a different position with the company, one that might be a better match for his skills. Mr. Bolton declined, and Ms. Goodwin orally warned him that she would begin Sprint's corrective-action process.

On July 15, Mr. Bolton was placed on written warning and told he must improve in 30 days or he would be placed on final written warning. He was given a list of discrete goals to meet, including completion of assignments in the allocated time and with minimal errors, and was given the opportunity to make a presentation on a topic of his choice. Mr. Bolton's presentation fell well short of the expectations of Ms. Goodwin, Ms. Becker, and Ms. Mitchell. Further performance problems were documented, and Ms. Goodwin, along with Mr. Stranimier, who had taken over as Mr. Bolton's immediate supervisor from Ms. Becker, placed Mr. Bolton on final written warning on August 15.

After additional performance problems and another presentation that met with criticism, Ms. Goodwin and Mr. Stranimier terminated Mr. Bolton's employment on October 3, 2003. He was 50 years old. For a short time after his

---

[2] Following Mr. Bolton's commencement of this litigation, Ms. Mitchell had occasion to testify that she was surprised to learn of Mr. Bolton's termination, Aplt. App., Vol. II at 630:13-24, and that she had not observed in Mr. Bolton's performance any problems that warranted his termination, *id.* at 625:22 to 626:2.

discharge, Mr. Bolton worked for a contractor as a temporary worker performing tasks for Sprint similar to the work he performed as a member of the ARMS team. Mr. Bolton completed this temporary work without any review of his performance.

After obtaining a right-to-sue letter from the Equal Employment Opportunity Commission, Mr. Bolton filed suit. The district court entered summary judgment in favor of Sprint, and Mr. Bolton appeals.

## II. Analysis

### A. General Legal Standards

We review the district court's grant of summary judgment de novo, using the same legal standard applicable in the district court. *Baca v. Sklar*, 398 F.3d 1210, 1216 (10th Cir. 2005). Summary judgment should be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). Under this standard, we view the evidence, and draw all reasonable inferences from it, in the light most favorable to the nonmoving party. *Baca*, 398 F.3d at 1216.

In evaluating an ADEA claim based on indirect evidence of discrimination, we use the burden-shifting framework outlined in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-04 (1973), and its progeny. *See McKnight v. Kimberly*

*Clark Corp.*, 149 F.3d 1125, 1128 (10th Cir. 1998) (applying *McDonnell Douglas* to ADEA claim). Within this framework, a plaintiff must initially establish a prima facie case of age discrimination. *See McDonnell Douglas*, 411 U.S. at 802. This burden is "not onerous." *Plotke v. White*, 405 F.3d 1092, 1099 (10th Cir. 2005) (quotation omitted). If a plaintiff establishes a prima facie case, the burden shifts to the defendant "to articulate some legitimate, nondiscriminatory reason" for its action. *McDonnell Douglas*, 411 U.S. at 802. If the defendant meets this burden, "summary judgment is warranted unless the employee can show there is a genuine issue of material fact as to whether the proffered reasons are pretextual." *Plotke*, 405 F.3d at 1099.

## B.  Prima Facie Case

In a typical ADEA case based on discharge, a plaintiff establishes a prima facie case by showing that he (1) is within the protected age group (i.e., at least forty years old, *see* 29 U.S.C. § 631(a)); (2) was doing satisfactory work; (3) was discharged; and (4) was replaced by a younger person. *See, e.g., Rivera v. City & County of Denver*, 365 F.3d 912, 920 (10th Cir. 2004). But whether the claim arises under the ADEA or another antidiscrimination statute, the fourth element of a prima facie case "is a flexible one that can be satisfied differently in varying scenarios." *Plotke*, 405 F.3d at 1100. As the district court recognized, when a plaintiff is not replaced by a younger worker, which appears to be the case here, a plaintiff may satisfy the fourth element with a more general showing that his

discharge "occurred under circumstances which give rise to an inference of discrimination." *Id.* (quotation omitted).

There is no dispute that Mr. Bolton satisfies the first and third prongs of the prima facie case—he was 50 years old when he was discharged. As to the second element, the district court began its analysis by stating, "Defendant contends, and the court finds that the record demonstrates, that plaintiff was not performing up to the expectations of his employer at the time defendant terminated his employment." Aplt. App., Vol. II at 811. We agree with Mr. Bolton that the court's consideration of Sprint's nondiscriminatory reason for discharging him was impermissible at the prima facie stage of the analysis.

As we explained in *MacDonald v. Eastern Wyoming Mental Health Center*, 941 F.2d 1115 (10th Cir. 1991), concluding that plaintiffs "did not establish a prima facie case based on the reasons for their discharge raises serious problems under the *McDonnell Douglas* analysis" because it "frustrates a plaintiff's ability to establish that the defendant's proffered reasons were pretextual and/or that age was the determining factor." 941 F.2d at 1119. We therefore held that a plaintiff may meet the second element of "a prima facie case of discrimination in a discharge case by credible evidence that she continued to possess the objective qualifications she held when she was hired, or by her own testimony that her work was satisfactory, even when disputed by her employer, or by evidence that she

had held her position for a significant period of time." *Id.* at 1121 (citations omitted).

It is undisputed that Mr. Bolton worked as a software engineer for Sprint and its predecessor in interest from 1987, and specifically as an SE III on the ARMS team from 1995, until his discharge in 2003. Each of these periods of time, 16 and 8 years, respectively, is a significant period of time. *See id.* (concluding that four years was significant). Because the *MacDonald* test is phrased in the disjunctive, this fact alone is sufficient to establish the second element of the prima facie test. *See English v. Colo. Dep't of Corr.*, 248 F.3d 1002, 1008 (10th Cir. 2001) (relying only on length of plaintiff's employment to satisfy second element under *MacDonald*).

Mr. Bolton also argues that the district court erred in its consideration of the fourth element of the prima facie case, whether his discharge occurred under circumstances that give rise to an inference of discrimination. In its analysis of the fourth element, the district court considered much of the evidence that also goes to pretext. We will assume for purposes of this appeal, therefore, that Mr. Bolton has met his prima facie burden, which is not an onerous one, *see Plotke*, 405 F.3d at 1099, and analyze the evidence under the pretext standard. That pretext review may properly encompass evidence supporting the prima facie case. *See Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 143 (2000). Mr. Bolton has conceded that Sprint's proffered reason for discharging him

satisfies the company's burden under the second prong of the *McDonnell Douglas* framework, so we proceed to the pretext analysis that the district court did not reach.[3]

## C. Pretext

"Pretext can be shown by such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence and hence infer that the employer did not act for the asserted non-discriminatory reasons." *Morgan v. Hilti, Inc.*, 108 F.3d 1319, 1323 (10th Cir. 1997) (quotations omitted). We do not, however, "act as a super personnel department that second guesses employers' business judgments." *Simms v. Okla. ex rel. Dep't of Mental Health & Substance Abuse Servs.*, 165 F.3d 1321, 1330 (10th Cir. 1999) (quotation omitted).

Mr. Bolton first argues that older members of the ARMS team received generally lower performance ratings on their 2002 evaluations. For that year, two team members, aged 45 and 40, received the highest rating, "M."[4] *See* Aplt. App.,

---

[3] Because our review is de novo, we need not separately address Mr. Bolton's argument that the district court erred in its analysis by improperly weighing evidence, drawing inferences in favor of Sprint, and making credibility determinations. *See Rivera*, 365 F.3d at 920.

[4] To reiterate, the 2002 ratings were Most effective (M), Highly effective (H), Very effective (V), or Less effective (L).

Vol. II at 798.[5]  Three team members, aged 55, 34, and 28, received an "H"

rating.  *See id.*  Five team members, aged 57, 50, 42, 41, and 39, received a "V"

rating.  *See id.*  And three team members, aged 56, 49 (Mr. Bolton), and 27,

received the lowest "L" rating.  *See id.* at 797-98.  There is no age-related pattern

that raises an inference of discrimination evident in the distribution of these

ratings.  Two team members aged 45 and 40 received the highest rating and the

youngest team member received the lowest rating.  Moreover, Mr. Bolton's rating

was supported by Ms. Goodwin's narrative outlining his performance issues.

Mr. Bolton next argues that the youngest member of the team, Sandi

Ozgen, was not discharged even though he, like Mr. Bolton, received the lowest

rating for 2002.  This argument overlooks the fact that Mr. Ozgen left Sprint's

employment on April 22, 2003, apparently of his own volition.  Mr. Bolton was

not placed on written corrective action until July 15, 2003, and not discharged

until October 3, 2003.  No reasonable inference of age discrimination can arise

from Sprint's failure to place Mr. Ozgen on corrective action or terminate his

employment in shorter course than it took with Mr. Bolton.

---

[5]     This reference to the record is a chart set forth in the district court's
opinion summarizing the ages of the members of the ARMS team as well as their
performance ratings.  We reference this summary for convenience.  Mr. Bolton
has not taken issue with the accuracy of this summary, and nothing in the record
indicates that it is in error.

-13-

Mr. Bolton also points to two other ARMS team members, Paul McDonnell and Paul Robinson, who were discharged as part of a reduction in force (RIF) in 2004 when they were approximately 58 and 52 years old, respectively. Sprint argues that their discharge is irrelevant because they voluntarily left the ARMS group, were discharged from another group, and neither Ms. Goodwin nor Mr. Stranimier had any role in the decision to include them in the RIF.

Assuming *arguendo* that this evidence is relevant on these facts, even though a different supervisor was involved in the RIF, *see Mendelsohn v. Sprint/United Mgmt. Co.*, 466 F.3d 1223, 1226-28 (10th Cir. 2006) (declining to extend the "same supervisor" rule to contexts other than those involving discriminatory discipline), we conclude that it is of minimal probative value. Mr. Bolton has not provided any evidence or argument that would eliminate nondiscriminatory reasons for Sprint's discharge of Mr. McDonnell and Mr. Robinson. It would be unreasonable, therefore, to infer that Sprint maintained a company-wide policy of age discrimination that led to Mr. Bolton's termination from the bald fact that Sprint laid off two workers aged 58 and 52 as part of a RIF.

Mr. Bolton characterizes the evidence relating to his performance in 2003 as "sharply conflicting": specifically, the project evaluations completed by Ms. Becker and Ms. Mitchell; his own view of his performance; and the informal assessments—which Mr. Bolton refers to as "secret evaluation[s]," *see* Aplt.

Opening Br. at 11—conducted by Ms. Goodwin and Ms. Becker in 2003 of the technical abilities of the ARMS team members and the "Sprint Dimensions."

Contrary to his first contention, Ms. Becker's project evaluations do not sharply conflict with Ms. Goodwin's opinion of his ability to perform as an SE III on the ARMS team. Although Ms. Becker described Mr. Bolton's positive attributes, she also listed areas for growth or concern, in particular his need to make more independent decisions, Aplt. App., Vol. II at 709, and provide quicker code turn around, *id.* at 710, concerns similar to those that led to Mr. Bolton's corrective action and eventual discharge.

Similarly, Ms. Mitchell's evaluation was not unqualifiedly positive but identified problem areas. *See id.*, Vol. I at 394, 398.[6] Additionally, Ms. Mitchell's opinion that she saw nothing in Mr. Bolton's performance in 2003 warranting termination (*see supra* note 2) is insufficient to create a genuine issue of material fact as to the opinions of Ms. Goodwin, which concerned a broader period of time than just 2003, or those of Mr. Stranimier. *See Kendrick v. Penske Transp. Servs., Inc.*, 220 F.3d 1220, 1231 (10th Cir. 2000) (relevant pretext inquiry is how facts appeared to the decision maker). Likewise, in the pretext

---

[6] Contrary to Mr. Bolton's suggestion, we see no impropriety in the request that Ms. Mitchell document areas of concern that she had spoken to Mr. Bolton about but omitted from an earlier version of the evaluation.

analysis, Mr. Bolton's own opinion of his performance is irrelevant. *See Kelley v. Goodyear Tire & Rubber Co.*, 220 F.3d 1174, 1177-78 (10th Cir. 2000).

The part of the record to which Mr. Bolton cites in support of his contention that he was rated the same for technical proficiency on certain computer programming languages, systems, and applications as other ARMS team members who were not discharged is of such poor print quality that we are unable to read it in any meaningful way as to the technical proficiencies. *See* Aplt. App., Vol. II at 716. But even assuming Mr. Bolton's summation of the information is accurate, it says nothing about whether any of the other ARMS team members shared any of the specific performance problems that formed the basis for Mr. Bolton's discharge. In fact, the record is devoid of any such evidence. Thus, Mr. Bolton has not met his burden of showing that he was similarly situated to the other employees but was treated differently, and therefore the comparison is not legally relevant. *See Hysten v. Burlington N. & Santa Fe Ry. Co.*, 296 F.3d 1177, 1182 (10th Cir. 2002).

As to the ratings Ms. Goodwin and Ms. Becker gave him on the "secret evaluations" pertaining to the "Sprint Dimensions," we see no sharp conflict creating a material question of fact as to whether his discharge was pretextual. Again, the primary reasons for his discharge were his slow work pace, poor analytical skills, and need for assistance and approval for decisions. Those reasons are encompassed by the Sprint Dimensions of "Personal Effectiveness"

-16-

and "Leadership," the two categories for which Ms. Goodwin and Ms. Becker both gave him the same subpar score, "4" on a scale of "1" to "5," with "5" being the lowest score.

Mr. Bolton next contends that Ms. Goodwin's comments "that he 'had the longest tenure of anyone' on the ARMS team and that he 'should know more' based upon his years of experience," Aplt. Opening Br. at 29, give rise to an inference of age bias. This contention ignores the fact that Ms. Goodwin made those comments in the specific context of evaluating his performance—that is, Ms. Goodwin was expressing her criticism of Mr. Bolton's skill level in relation to the length of time he had worked on the ARMS team; it had nothing to do with how old he was despite the link between tenure and age. An employer may legitimately have an expectation that an employee's ability to perform a job will improve with experience, and nothing in Ms. Goodwin's expression of that expectation as to Mr. Bolton suggests that her true reason for discharging him was his age. Accordingly, we conclude that no reasonable inference of age bias can be drawn from Ms. Goodwin's comments, and therefore her comments do not create a genuine issue of material fact that Sprint's reason for discharging Mr. Bolton was pretextual.

Mr. Bolton's final contention is that the "secret evaluation" and the sequence of events leading up to his termination are the type of "disturbing procedural irregularities" that can constitute evidence of pretext, *Simms*, 165 F.3d

at 1328. He first points to the testimony of Rubye Beal, a Sprint human resources representative, suggesting that there was no company policy or guidelines related to the "secret evaluation." *See* Aplt. App., Vol. II at 650-51, Beal Depo. at 58:1 to 63:24. Even if this was true, we fail to see how an additional evaluation concerning characteristics apparently recognized by the company is suggestive of age bias. To the contrary, Ms. Becker testified that she completed such evaluations for anyone who applied for a different job with Sprint, *id.* at 681:7-12, and it is undisputed that she was trying to assist Mr. Bolton in obtaining a different position with the company.

The other alleged procedural irregularity concerns Sprint's corrective-action guidelines and the purportedly accelerated pace at which Mr. Bolton's corrective action proceeded, approximately 81 days in total. According to Mr. Bolton, the guidelines provide that a written warning *would* normally be in effect for three to nine months and a final written warning *would* normally be in effect for three to twelve months. Aplt. Opening Br. at 9. Mr. Bolton points to no record support for his interpretation, but our review indicates that the corrective-action process was subject to management discretion, and that although the aforementioned time frames *could* be used, local practice controlled. *See* Aplt. App., Vol. I at 319-20. Additionally, Ms. Beal testified that a person could spend a minimum of 30 days in each phase, *Id.*, Vol. II at 640, Beal Depo. at 20:20 to 21:4; that discretion is used to tailor the time frames to

each individual situation, *id.* at 647-48, Beal Depo. at 49:16 to 50:4; and that a 30-day time frame provides a good measure of an employee's improvement efforts, *id.* at 648, Beal Depo. at 51:4-6. Thus, the choices made as to Mr. Bolton were not procedurally irregular or suggestive of pretext.

We conclude that none of the evidence, even when viewed in the aggregate, *see E.E.O.C. v. Horizon/CMS Healthcare Corp.*, 220 F.3d 1184, 1200 (10th Cir. 2000), creates a genuine issue of material fact that Sprint's reason for terminating Mr. Bolton's employment was pretextual.

### III. Conclusion

The judgment of the district court is **AFFIRMED**.

Entered for the Court

Jerome A. Holmes
Circuit Judge